**O'HARA LAW APC**
Kevin O'Hara, Esq. (SBN: 314559)
1730 W. Cameron Ave, Ste. 200,
West Covina, CA 91790
kevin@oharalawapc.com

**LAW OFFICES OF BRIAN HURWITZ**
Brian Hurwitz, Esq. (SBN: 282817)
6565 W Sunset Blvd, Ste 410,
Los Angeles, CA 90028-7218
bhurwitz@hurwitzlawgroup.com
Attorneys for Plaintiffs,
Omar Aguirre and Yvette Aguirre

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF MAXWELL AGUIRRE, by and through successors in interest, Omar Aguirre and Yvette Aguirre; OMAR AGUIRRE, an individual; YVETTE AGUIRRE, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF LOS ANGELES, a public entity; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; SHERIFF ROBERT LUNA, in his individual and official capacities; SHERIFF SERGIO ALOMA, in his individual and official capacities; ROCIO DELGADO, in her individual and official capacities; REGISTERED NURSE GALEON, in his individual and official capacities; LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES; and DOES 1 through 50, individually, jointly and severally,<br><br>Defendants. | **CASE NO.  2:24-cv-5318**<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Failure to Protect from Harm, Fourteenth Amendment Violation (42 U.S.C. § 1983);<br>2. Failure to Provide Medical and Mental Health Care, Fourteenth Amendment Violation (42 U.S.C. § 1983);<br>3. Deprivation of the Right to Familial Relationship with Decedent (42 U.S.C. § 1983);<br>4. Policies, Customs, Practices Causing Constitutional Violations (*Monell*, 42 U.S.C. § 1983);<br>5. Supervisory Liability Causing Constitutional Violations (Failure to Properly Train, Supervise and Discipline, 42 U.S.C. § 1983);<br>6. Negligence – Wrongful Death;<br>7. Violation of California Government Code §845.6;<br>8. Violation of California Civil Code §52.1 (Tom Bane Act);<br>9. Declaratory Relief (28 U.S.C. § 2201)<br>10. Intentional Infliction of Emotional Distress<br>11. Negligent Infliction of Emotional Distress<br>12. Survival Action<br><br>**DEMAND FOR JURY TRIAL** |

1

**COMPLAINT FOR DAMAGES**

## COMPLAINT FOR DAMAGES

**COME NOW** Plaintiffs ESTATE OF MAXWELL AGUIRRE, by and through successors in interest, Omar Aguirre and Yvette Aguirre; Omar Aguirre, individually; and Yvette Aguirre, individually, allege as follows:

### I.

### INTRODUCTION

1.    This civil rights action seeks to establish the true and unequivocal facts surrounding the in-custody events and circumstances at the Los Angeles County Sheriff's Department, Twin Towers Correctional Facility leading to tragedy. This action arises out of the wrongful death of Maxwell Aguirre, who on or about September 22, 2023, was found hanging in his cell. After several days in a coma, Maxwell Aguirre passed away on or about September 29, 2023. This action also seeks to bring to public light the deliberate disregard for safety and protection carried out by the individual defendants in the present action.

2.    Maxwell Aguirre was the 22 year old pleasant and polite, tender, extremely respectful, well spoken, loving and only son of Plaintiffs parents Omar Aguirre and Yvette Aguirre who have been married for over 30 years. Maxwell was born in Pleasanton, California and grew up and lived in a large and traditional nuclear family until he joined the United States Air Force.



3.    Maxwell's father Omar Aguirre is an Emergency Department Registered Nurse. Maxwell's mother Yvette Aguirre has worked as an office manager for over 17 years.

4.    Maxwell is best described by his life of service. Maxwell had an unwavering dedication to God and his Church, love of his family and country, and had a history of dependability, punctuality, and responsibility. Maxwell was a model citizen and lived an exemplary life. Maxwell had a zero history of drug use including vaping and smoking. Maxwell was never involved with gangs nor had any body tattoos.

COMPLAINT FOR DAMAGES

Maxwell was a licensed driver and maintained a perfect DMV driving record with zero history of any accidents or infractions. Maxwell had a flawless reputation and a zero-crime history and has never been convicted of a single crime in his life.

5.      Maxwell had an extensive tightly-knit secondary family network with his Church. Maxwell was extremely orderly and punctual and was rarely absent to weekly services at Lifeway Church in Glendale, California. Maxwell also volunteered as a camp counselor and for many other Church related weekly activities. Maxwell was devoutly religious and studied the Bible so thoroughly that his personal copy was highlighted and annotated on almost every single page. Maxwell was chosen to deliver Sunday church service sermon for over 300 parishioners behind the main pulpit.

6.      Maxwell was 6-4" tall, muscular, physically healthy, handsome, charismatic, and his visage was punctuated by pristine crystal-clear hazel-colored eyes. Maxwell was loved by hundreds of friends and family. His Facebook profile is that of both his parents and his three sisters. Maxwell was also known for being an athletic outdoorsman, who loved weightlifting, competitive swimming, playing baseball, running, and hiking amongst nature. Maxwell was a Junior Lifeguard in Los Angeles. He had a penchant for traveling and experiencing different cultures. Maxwell had a gorgeous girlfriend named  Georgine Hernandez whom he would talk to daily. Maxwell planned to get married and have a large family. Maxwell was a college graduate. Maxwell maintained a scholastic Grade Point Average above 3.2. Maxwell had was known for his dependability and responsibility. Maxwell maintained perfect financial history and was never late with his financial obligations. Maxwell had a brilliant memory, was well read, and had interest in history and personal finance. Maxwell maintained an excellent Top-Tier FICO credit score of over 740. Maxwell was financially frugal and an excellent investor. Maxwell had extensive practical, applied knowledge and experience in property

**COMPLAINT FOR DAMAGES**

maintenance including plumbing, electrical, painting, framing, drywall, roofing, and appliance repair. Maxwell routinely helped his father and was part of a priceless Father-Son team in property management. Maxwell's parents Omar Aguirre and Yvette Aguirre have been married for over 30 years. Maxwell was part of a stable family unit.

7. Maxwell deeply loved the United States of America. After graduating from college, Maxwell served in the United States Airforce and wanted to follow in the footsteps of his grandparents who served in the Military and other family members who served before him such as United States Major-Geneal Paul Ragains. Maxwell was Honorably discharged after suffering from a mental health crisis while in service.

8. Maxwell was a pre-trial detainee prior to the events and circumstances that form the basis of his wrongful death and this lawsuit. Maxwell is presumed innocent for allegations made against him because he was yet to stand trial.

9. Since 2023, Defendant COUNTY OF LOS ANGELES' correctional facilities, including the LOS ANGELES COUNTY SHERIFF'S DEPARTMENT's Twin Towers Correctional Facility, Men's Central Jail, Century Regional Detention Facility, Inmate Reception Center and the Pitchess Detention Facilities (hereinafter collectively "COUNTY Jails"), have harbored in excess of fifty-seven (57) in-custody deaths. Many of these deaths involve suicide.

10. Long before MAXWELL AGUIRRE's death, each of the individually named Defendants from the COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT and the LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES knew that there existed a great indifference to the safety and protection of the inmates who were in the government's custody within the COUNTY Jails.

11. The Defendants' deliberate indifference towards pretrial detainees suffering from mental health issues resulted in dozens of suicides since 2018. From January 2018 through September 2023, at least twenty-six (26) inmates have died by suicide within the COUNTY Jails.

12. The individuals defendants named in the present lawsuit were repeatedly put on notice of the great dangers which existed within the COUNTY Jails through the long history of in-custody deaths; the federal civil rights action *United States of America v. County of Los Angeles and*

**COMPLAINT FOR DAMAGES**

*Los Angeles County Sheriff Jim McDonnell*, United States District Court, Central District of California, Case No. 15-5903 targeting the COUNTY Jails' custody and medical staff's deliberate indifference to the safety and protection of inmates, particularly those who were at risk of suicide; the warnings from neutrally-selected experts regarding the COUNTY Jails' custody and medical staff's failures amounting to constitutional violations; the U.S. Department of Justice's request for federal court oversight of comprehensive reforms designed to prevent and respond more effectively to suicides and self-inflicted injuries; and through a voluntarily entered Settlement Agreement which required that the COUNTY OF LOS ANGELES and the LOS ANGELES COUNTY SHERIFF'S DEPARTMENT remedy all of the deficiencies addressed in the *United States of America v. County of Los Angeles and Los Angeles County Sheriff Jim McDonnell* federal civil rights action.

13.     Merely 3 months before the subject incident, U.S. District Judge Dean D. Pregerson approved a settlement between people incarcerated in Los Angeles jails — represented by the ACLU National Prison Project and ACLU Foundation of Southern California — and the L.A. County Board of Supervisors and Sheriff Sergio Aloma.

14.     During the ACLU lawsuit, numerous incarcerated people who had their medication discontinued upon arrest/intake reported to the ACLU and the court that they had suffered severe psychological distress. Studies have shown that more than 40% of jail suicides happen in the first seven days after being jailed, and a quarter of all suicides occur in the first three days. As part of the settlement, L.A. County agreed to increase mental health staffing in the inmate reception center (IRC).

15.     Despite this long history of complete disregard to inmate safety and protection, each of the individually named defendants in this lawsuit deliberately failed to take even modest actions to prevent in-custody deaths at the COUNTY Jails.  Thus, by the time MAXWELL AGUIRRE was taken into custody and placed at the Twin Towers Correctional Facility, the jail was infested with endemic, ongoing and unabated risks of injury or death to inmates – risks which indeed resulted in MAXWELL AGUIRRE's hanging on September 22, 2023 and ultimate death on September 29, 2023.

16. Contributing to the systemic issues of complete disregard to inmate safety and protection at the COUNTY jails is an environment that encourages dereliction of staff duties.

17. On September 3, 2023, Maxwell was treated for toxic ingestion of Seroquel pills on September 3, 2023 (a suicide attempt).

18. Upon information and belief, from September 5, 2023. to September 12, 2023, Mr. Aguirre was placed in high observation mental health housing where he received routine follow-up care by the mental health team. For unknown reasons, on September 13, 2023, Mr. Aguirre transitioned from high observation mental health housing to moderate observation mental health housing.

19. Contributing to the systemic issues of suicide attempts at COUNTY jails is a decrepit environment. Within high observation housing, Maxwell had no access to books, human contact, sunlight, showers, and dignity. High Observation Housing becomes tantamount to clinically inappropriate punishment that can exacerbate the negative mental health condition pre-trial detainees, such as Maxwell Aguirre, were already experiencing. This phenomenon has been documented by the Department of Justice in a memorandum to County Counsel regarding suicide prevention.

20. Given the recent suicide attempt on September 3, 2023, suicide precautions should have been in effect for Maxwell Aguirre at all times prior to September 22, 2023.[1] Adequate precautions were not in effect.

21. Additionally, on September 22, 2023, officers in charge of doing welfare checks on inmates including Maxwell Aguirre failed to perform the required welfare checks due to improper internet usage, streaming, and absconding of their duties to instead watch Youtube, Netflix, social media, and/or other media distractions, and/or other misadministration of their duties, in violation of Maxwell Aguirre's (and other inmates') civil rights.

---

[1] When Jail staff discontinue suicide precautions despite a reasonable inference that the prisoner is still at risk for self-harm, the staff demonstrate deliberate indifference to the prisoner's suicide risk. *Clouthier v. County of Contra Costa*, 591 F.3d at 1244-45.

6

**COMPLAINT FOR DAMAGES**

22. In failing to perform their welfare checks, officers failed to identify that Maxwell Aguirre had covered the window to his cell and hung himself.

23. Other pre-trial detainees made noises to alert staff of Maxwell Aguirre's covered cell window and potential suicide risk. When officers finally responded to the cell, they discovered Maxwell Aguirre hanging, but still alive.

24. When the officers cut down Maxwell Aguirre, they did so callously and with no regard for Maxwell's health and dignity.

25. Maxwell became brain dead as a result of the incident, and ultimately passed away on days later on September 29, 2023 at Los Angeles General Medical Center.

26. Maxwell Aguirre was harmed on multiple occasions at Twin Towers and through the maladministration of duties of medical personnel and corrections personnel from the County of Los Angeles, Los Angeles County Department of Health, and/or Correctional Health Services. County Defendants were poorly trained for handling mental health inmates at suicide risk.

27. After an informant notified Los Angeles Public Press of the misadministration of duties, internet access was restricted and/or removed from deputy workstations at Twin Towers.

## II.

## <u>JURISDICTION AND VENUE</u>

28. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourteenth Amendment to the United States Constitution, and the laws and Constitution of the State of California. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

29. This Court has the authority to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201, as well as Federal Rules of Civil Procedure 57, including pursuant to the Court's inherent equitable powers.

30. Venue is proper within the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside within this district and the events and omissions giving rise to Plaintiffs' claims occurred within this district.

**COMPLAINT FOR DAMAGES**

### III.

### PENDANT CLAIMS

31.     Plaintiffs presented their government claims on November 29, 2023. The government claims were rejected on December 27, 2023. As such, Plaintiffs have complied with the California Tort Claims Act requirements with respect to their claims arising under state law.

32.     With respect to these supplemental state claims, Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over such claims as they arise from the same facts and circumstances which underlie the federal claims.

### IV.

### PARTIES

#### A.  Plaintiffs

33.     Decedent MAXWELL AGUIRRE was a 22-year-old son of Plaintiffs Omar Aguirre and Yvette Aguire. At the time of his death, he was a pretrial detainee who resided in the County of Los Angeles, California. The claims made by Plaintiff ESTATE OF MAXWELL AGUIRRE are brought by the successors in interest, Omar Aguirre and Yvette Aguirre.

34.     Plaintiff Omar Aguirre is and was, at all times relevant hereto, a resident of the County of Los Angeles, California, and was the natural father of decedent MAXWELL AGUIRRE. MAXWELL AGUIRRE died in-custody at the COUNTY Jails. Plaintiff brings these claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions. Plaintiff also brings her claims individually and on behalf of decedent MAXWELL AGUIRRE on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law and California law.

35.     Plaintiff Yvette Aguirre is and was, at all times relevant hereto, a resident of the County of Los Angeles, California, and was the natural mother of decedent MAXWELL AGUIRRE. MAXWELL AGUIRRE died in-custody at the COUNTY Jails. Plaintiff brings these claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions. Plaintiff also brings her claims individually and on

8

**COMPLAINT FOR DAMAGES**

behalf of decedent MAXWELL AGUIRRE on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law and California law.

**B.  Defendants**

36.     Defendant COUNTY OF LOS ANGELES (hereinafter also "COUNTY") owns, operates, manages, directs and controls Defendant LOS ANGELES COUNTY SHERIFF'S DEPARTMENT (hereinafter also "LASD"), also a separate public entity, which employs other Doe Defendants in this action. At all times relevant to the facts alleged herein, Defendant COUNTY was responsible for assuring that the actions, omissions, policies, procedures, practices and customs of its employees, including LASD employees, complied with the laws and the Constitutions of the United States and of the State of California.  Defendant COUNTY, through LASD, is and was responsible for ensuring the protection and safety of all persons incarcerated at the LASD correctional facilities, including the Twin Towers Correctional Facility (hereinafter "TTCF"), Men's Central Jail (hereinafter "MCJ"), Century Regional Detention Facility (hereinafter "CRDF"), Inmate Reception Center (hereinafter "IRC") and the Pitchess Detention Facilities (hereinafter collectively "COUNTY Jails").

37.     Defendant ROBERT LUNA ("SHERIFF LUNA"), at all times mentioned herein, was the Sheriff of the LOS ANGELES COUNTY SHERIFF'S DEPARTMENT (hereinafter also "LASD"), the administrator of the COUNTY Jails, including TTCF, and the custodian of the pretrial detainees within it; and the ultimate policy maker for the LASD and the COUNTY Jails.[2] SHERIFF LUNA and his custody staff, or those working in the jail, DOES 1-50, were peace officers, sergeants, captains, lieutenants, commanders and undersheriffs, doctors, nurses and/or civilian employee agents, policy makers and/or agents and representatives of the COUNTY and the LASD, as well as employees, agents and representatives of said Defendants. At all times relevant hereto, each of those named as DOES, were acting within the course and scope of their employment which was incidental to Defendants COUNTY and the LASD's enterprise, and the wrongful acts hereinafter described flow from the very exercise of their authority. They are sued in their individual and official capacities. SHERIFF LUNA is sued both in his official and personal and

**COMPLAINT FOR DAMAGES**

individual capacity as a supervisory official for his own culpable action or inaction in the training, supervision, or control of his subordinates, or for his acquiescence in the constitutional deprivations which this Complaint alleges, or for conduct that showed a reckless or callous indifference to the rights of others. SHERIFF LUNA's affirmative conduct involves his failure to ensure enforcement of policies, rules, or directives that set in motion a series of acts by others which he knew or reasonably should have known, would cause others to inflict the constitutional injury.

38.    Defendant SERGIO ALOMA ("SHERIFF ALOMA"), at all times mentioned herein, was the Sheriff of the LOS ANGELES COUNTY SHERIFF'S DEPARTMENT (hereinafter also "LASD"), the administrator of the COUNTY Jails, including TTCF, and the custodian of the pretrial detainees within it; and the ultimate policy maker for the LASD and the COUNTY Jails. SHERIFF ALOMA and his custody staff, or those working in the jail, DOES 1-50, were peace officers, sergeants, captains, lieutenants, commanders and undersheriffs, doctors, nurses and/or civilian employee agents, policy makers and/or agents and representatives of the COUNTY and the LASD, as well as employees, agents and representatives of said Defendants. At all times relevant hereto, each of those named as DOES, were acting within the course and scope of their employment which was incidental to Defendants COUNTY and the LASD's enterprise, and the wrongful acts hereinafter described flow from the very exercise of their authority. They are sued in their individual and official capacities. SHERIFF ALOMA is sued both in his official and personal and individual capacity as a supervisory official for his own culpable action or inaction in the training, supervision, or control of his subordinates, or for his acquiescence in the constitutional deprivations which this Complaint alleges, or for conduct that showed a reckless or callous indifference to the rights of others. SHERIFF ALOMA's affirmative conduct involves his failure to ensure enforcement of policies, rules, or directives that set in motion a series of acts by others which he knew or reasonably should have known, would cause others to inflict the constitutional injury.

39.    Defendant ROCIO DELGADO is a clinical social work supervisor for Los Angeles County Department of Health. Defendant ROCIO DELGADO was acting within the course and scope of their employment which was incidental to Defendants COUNTY and the LASD's enterprise, and the wrongful acts hereinafter described flow from the very exercise of her authority.

**COMPLAINT FOR DAMAGES**

She is sued in her individual and official capacities. Defendant ROCIO DELGADO was personally informed by Omar Aguirre of Maxwell Aguirre's mental health history and honorable discharge from the military. Defendants ROCIO DELGADO and Does 1-50 misclassified and maladministered Maxwell Aguirre's care and supervision, such that Maxwell Aguirre was harmed on multiple instances, including (1) toxic ingestion of Seroquel pills on September 3, 2023 (a suicide attempt), and (2) the hanging incident on September 22, 2023, ultimately leading to Maxwell Aguirre becoming brain dead and passing away days later on September 29, 2023. Defendants ROCIO DELGADO and Does 1-50 directed Maxwell Aguirre to be moved from high observation housing despite obvious signs of an ongoing mental health crisis, including an attempted suicide on September 3, 2023.

40.     Defendant REGISTERED NURSE GALEON is a registered nurse for Los Angeles County Department of Health. Defendant REGISTERED NURSE GALEON was acting within the course and scope of their employment which was incidental to Defendants COUNTY and the LASD's enterprise, and the wrongful acts hereinafter described flow from the very exercise of his authority. He is sued in his individual and official capacities. Upon information and belief, Defendant REGISTERED NURSE GALEON was informed of Maxwell Aguirre's mental health history and honorable discharge from the military. Defendants REGISTERED NURSE GALEON, and Does 1-50 misclassified and maladministered Maxwell Aguirre's care and supervision, such that Maxwell Aguirre was harmed on multiple instances, including (1) toxic ingestion of Seroquel pills on September 3, 2023 (a suicide attempt), and (2) the hanging incident on September 22, 2023 ultimately leading to Maxwell Aguirre becoming brain dead and passing away days later on September 29, 2023. Defendants REGISTERED NURSE GALEON and Does 1-50 directed Maxwell Aguirre to be moved from high observation housing despite obvious signs of an ongoing mental health crisis, including an attempted suicide on September 3, 2023. In addition, REGISTERED NURSE GALEON intentionally, recklessly, negligently, and inaccurately misrepresented the condition of Maxwell Aguirre to Omar Aguirre and Yvette Aguirre following the September 22, 2023, hanging incident. During a telephone call to Omar Aguirre and Yvette Aguirre, NURSE GALEON lied and mislead Omar Aguirre and Yvette Aguirre about the condition

**COMPLAINT FOR DAMAGES**

of their son, Maxwell, stating that he was in "stable condition." When NURSE GALEON told Omar Aguirre and Yvette Aguirre that Maxwell was in "stable condition," he knew or should have known that Maxwell was brain dead and in critical condition. This misleading statement led to severe emotional distress of Omar and Yvette Aguirre. Additionally, Nurse GALEON refused to provide additional information and medical records, doctors notes, and images to Omar and Yvette Aguirre despite the execution of a valid HIPAA release from Maxwell Aguirre to release information to his parents. When requests were escalated to Charge Nurse and Los Angeles Medical Center house supervisor, they were still denied.

41.    Defendant COUNTY owns, operates, manages, directs and controls Defendant LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES (hereinafter also "LACDHS"), also a separate public entity, which employs other Doe Defendants in this action. At all times relevant to the facts alleged herein, Defendant COUNTY was responsible for assuring that the actions, omissions, policies, procedures, practices and customs of its employees, including the LACDHS Correctional Health Services employees (hereinafter also "CHS") which are assigned to provide medical care to inmates housed at the COUNTY Jails, complied with the laws and the Constitutions of the United States and of the State of California.  Defendant COUNTY, through LACDHS, is and was responsible for ensuring the safety of all persons incarcerated at the COUNTY Jails, including the TTCF, and providing them appropriate medical and mental health treatment.

42.    Defendants COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES, SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and REGISTERED NURSE GALEON will hereinafter be referred to as the COUNTY DEFENDANTS.

43.    Plaintiffs are ignorant of the true names and capacities of Defendants DOES 1 through 50 ("DOE Defendants") and therefore sue these Defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein. Plaintiffs will amend their complaint to state the names and capacities of each DOE Defendant when they have been ascertained.

12

**COMPLAINT FOR DAMAGES**

44.     The identities, capacities, and/or nature of involvement of the defendants sued as DOES 1 through 50 are presently unknown to the Plaintiffs who therefore sue these defendants by fictitious names. Plaintiffs are informed, believe, and thereupon allege that DOES 1 through 50 include individual law enforcement personnel and medical personnel employed by the LASD, and that they were involved in some manner and are legally responsible for the wrongful acts and conduct alleged herein. Plaintiffs will amend this complaint to substitute the DOE Defendants' true names and capacities when they have been ascertained. Plaintiffs are informed, believe, and thereupon allege that each DOE defendant is a resident of California. Upon information and belief, DOES 1 through 50 were and still are residents of the County of Los Angeles, California. DOES 1 through 50 are sued in both their individual and official capacities.

45.     At all relevant times, DOES 31-40 were managerial, supervisorial, training, and/or policymaking employees of Defendant COUNTY. At the time of the incident, DOES 31-40 were acting under color of law within the course and scope of their duties as employees for the COUNTY. They had supervisorial authority over DOES 1-50, and the COUNTY employees at the COUNTY Jails. DOES 31-40 were acting with the complete authority and ratification of their principal, Defendant COUNTY.

46.     At all relevant times, DOES 41-50 were managerial, supervisorial, training, and/or policymaking employees of Defendant COUNTY. At the time of the incident, DOES 41-50 were acting under color of law within the course and scope of their duties as employees for the LASD and/or the COUNTY. They had supervisorial authority over DOES 1-50, and the employees of the LASD. DOES 41-50 were acting with the complete authority and ratification of their principal, Defendant COUNTY.

47.     Each of the defendants, including the DOE defendants, caused, and is responsible for, the unlawful conduct and resulting injuries suffered by Plaintiffs by, among other things, personally participating in the unlawful conduct, acting jointly, or conspiring with others who did so; by ordering, authorizing, acquiescing in, or setting in motion policies, plans, or actions that led to the unlawful conduct, by failing to take action to prevent the unlawful conduct; by failing and refusing to initiate and maintain adequate training and supervision; by failing to enact policies to

13

**COMPLAINT FOR DAMAGES**

address the constitutional rights of protesters despite the obvious need for such a policy; and by ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

48.     Plaintiffs are informed and believe and thereon allege that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiffs are further informed and believe and thereon allege that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged. At all material times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiffs' and decedent MAXWELL AGUIRRE's constitutional rights and other harm.

49.     Plaintiffs are informed, believe, and thereupon allege that, at all times relevant hereto, Defendants, and each of them, acted as the agents, servants, and employees of each of the other defendants.

50.     In doing each of the acts and/or omissions alleged herein, Defendants, and each of them, acted within the course and scope of their employment.

51.     In doing each of the acts and/or omissions alleged herein, Defendants, and each of them, acted under color of authority and/or under the color of law.

**V.**

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

52.     Plaintiffs reallege and incorporate by reference Paragraphs 1-48 above.

53.     Maxwell Aguirre had never been convicted of a crime in his life. As a pretrial detainee, he maintained his innocence for charges brought against him.

54.     The LASD custody staff and the CHS medical staff were aware that MAXWELL AGUIRRE had a history of multiple indicators of elevated suicide risk.  Indeed, Mr. Aguirre

14

**COMPLAINT FOR DAMAGES**

displayed gravely concerning suicidal behavior and emotional distress upon arriving as a pretrial detainee at the COUNTY Jails.

55.     Upon information and belief, from July 19. 2023, to September 2, 2023, Mr. Aguirre was in mental health housing of Twin Towers Correctional Facility (TTCF) where Correctional Health Services mental health team provided routine follow-up care and treatment for his diagnoses of unspecified depressive disorder, unspecified anxiety disorder, unspecified psychotic disorder, and rule out schizophrenia.

56.     On September 3, 2023. Mr. Aguirre complained of lightheadedness and dizziness after he ingested "10-20" Seroquel pills of unknown strength and Benadryl which were not prescribed to him. Corrections officers at Twin Towers Correctional Facility failed to ensure that medications were not transferred from other inmates to Mr. Aguirre and/or improperly availed for access to Mr. Aguirre. This September 3 ingestion was evidence of a potential suicide attempt, warranting close observation and preventative care.

57.     Mr. Aguirre was transferred by paramedics to Los Angeles General Medical Center (LA General MC) where he was treated and monitored. Mr. Aguirre was discharged back to jail on September 5, 2023 with diagnoses of unspecified psychiatric disorder, schizophrenia, and anticholinergic and Seroquel overdose.

58.     Upon information and belief, from September 5, 2023. to September 12, 2023, Mr. Aguirre was placed in high observation mental health housing where he received routine follow-up care by the mental health team. For unknown reasons, on September 13, 2023, Mr. Aguirre transitioned from high observation mental health housing to moderate observation mental health housing.

59.     On or about September 22. 2023, at approximately 1528 hours, medical personnel were summoned to Mr. Aguirre's cell in TTCF due to a suicide attempt by "hanging." He was unresponsive. pulseless. and not breathing. Medical personnel and paramedics initiated resuscitative efforts which resulted in a return of spontaneous circulation. Mr. Aguirre was then transported to LA General MC.

60.     Mr. Aguirre passed away on or about September 29, 2023.

15

**COMPLAINT FOR DAMAGES**

61.     The CHS medical staff were aware that Mr. Aguirre had ingested Seroquel pills and was an elevated suicide risk. Any competent mental health staff would have considered Mr. Aguirre's clinical history of mental illness and treatment with psychiatric medications to be associated with a significantly elevated risk of suicide.

62.     Mr. Aguirre was housed within a recently established dorm for veterans.

63.     On September 22, 2023, County Staff failed to conduct safety checks of Mr. Aguirre as required within their duties, and with full knowledge that Mr. Aguirre was a heightened suicide risk. During this time, Mr. Aguirre hung himself.

64.     County Staff had access to Mr. Aguirre's medical records and knew that Mr. Aguirre had a history of suicidal ideation and knew that Mr. Aguirre had attempted suicide through ingestion of Seroquel pills on September 3, 2023.

65.     Additionally, Maxwell Aguirre's father, Omar Aguirre had given an oral history of Maxwell Aguirre's mental health crisis in the military to Defendant ROCIO DELGADO.

66.     Any competent mental health staff would have considered Mr. Aguirre's past and current suicidal behavior; attempted suicide; and history of mental disorder and treatment with psychiatric medications to be significant elevated risks of suicide in a jail environment warranting a suicide prevention plan with heightened levels of supervision and monitoring and the removal of any suicide hazards from Mr. Aguirre's housing unit.

67.     The LASD custody staff and the CHS medical staff ignored all of the signs of significantly elevated suicide risk when they decided to house Mr. Aguirre alone in a dormitory with no direct observation capabilities, with no suicide precautions and full access to a litany of items which could be used for self-harm. They additionally failed to consult with the mental health clinicians regarding Mr. Aguirre's elevated risk of suicide. Despite all of the overt signs that Mr. Aguirre had an elevated risk of suicide, he was placed alone in a dormitory with no suicide precautions and no increased observation or monitoring by correctional officers.

68.     The LASD custody staff and CHS medical staff failed to implement a suicide prevention plan which put in place monitoring or housing protocols for inmates that were removed from Suicide Watch status but continued to have an elevated risk of suicide. Any competent custody

16

**COMPLAINT FOR DAMAGES**

staff and/or mental health staff would have recognized that Mr. Aguirre had a significantly elevated suicide risk, inter alia, *the fact that he had already attempted suicide on September 3 via toxic ingestion of Seroquel pills.* Any competent custody staff and/or mental health staff would have proceeded to place him in housing with substantially improved observation capabilities and without suicide hazards, such as electrical cords and showerheads that could be used as ligatures and attachment points, respectively.

69.    The LASD custody staff and CHS medical staff were not provided with training or supervision regarding what they should do if an inmate was removed from Suicide Watch but continued to have an elevated suicide risk. There were no guidelines for additional monitoring or the removal of suicide hazards that could be used as ligatures (e.g., electrical cords) and attachment points (e.g., shower heads) for inmates with an elevated risk after they were removed from Suicide Watch.

70.    On September 22, 2023, Mr. Aguirre hanged himself. Ultimately, Mr. Aguirre had easy access to the items he needed to complete his suicide within his dormitory. Ultimately, the County failed to conduct safety checks and failed to prevent this foreseeable tragedy.

71.    Upon information and belief, due to the COUNTY Jails patterns and practices of not conducting proper and timely Title 15 welfare and safety checks, MAXWELL AGUIRRE's dire need for emergency medical intervention went unnoticed by the LASD custody and the CHS medical staff, who were responsible for monitoring and ensuring the welfare of all inmates, including MAXWELL AGUIRRE.

72.    Mr. Aguirre displayed recurrent signs of elevated suicide risk prior to September 22, 2023, yet the officers did nothing to ensure direct observation or to increase the safety of his housing.

73.    Mr. Aguirre did not respond well to life-saving measures. He was brain dead for the next several days and was ultimately pronounced dead on September 29, 2023.

74.    MAXWELL AGUIRRE was twenty-two years old when he died on September 29, 2023, while he was in custody at the Twin Towers Correctional Facility.

**COMPLAINT FOR DAMAGES**

75.     MAXWELL AGUIRRE was a pretrial detainee, and therefore, innocent until proven guilty.

76.     Plaintiffs timely and properly filed tort claims with the County of Los Angeles pursuant to California Government Code sections 910, *et seq*., and this action is timely filed within all applicable statutes of limitation.

77.     This complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

## VI.

## FACTUAL ALLEGATIONS COMMON TO *MONELL* AND SUPERVISORIAL CAUSES OF ACTION

78.     Plaintiffs reallege and incorporate by reference Paragraphs 1-74 above.

79.     Based upon the principles established in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), Defendants are liable for all injuries sustained by Plaintiffs as set forth herein. To establish municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), a plaintiff must prove: (1) that [the plaintiff] possessed a constitutional right of which she was deprived; (2) that the municipality had a policy/custom/practice; (3) that this policy/custom/practice amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy/custom/practice is the moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir, 2011). The policy/custom/practice "need only cause the constitutional violation; it need not be unconstitutional per se." *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994). Recognized paths to *Monell* liability include: (1) an unconstitutional custom, practice or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train or failure to have a needed policy; and (3) a final policy-maker's involvement in or ratification of the conduct underlying the violation of rights. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249-1250 (9th Cir. 2010).

18

**COMPLAINT FOR DAMAGES**

**A. For Decades, the U.S. Department of Justice Has Consistently Found the Los Angeles County Jail System to Violate Constitutional Rights of Inmates with Mental Illness and Failures to Provide Adequate Suicide Prevention.**

80. On August 5, 2015, the United States Department of Justice filed a lawsuit against the COUNTY OF LOS ANGELES and the LOS ANGELES COUNTY SHERIFF'S DEPARTMENT for violations of the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C.§ 1997-l997j, as well as violations of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141.[3]

81. That same day, the Department of Justice reached a settlement with the COUNTY OF LOS ANGELES and the LOS ANGELES COUNTY SHERIFF'S DEPARTMENT to protect inmates from serious suicide risks and excessive force in the COUNTY Jails.[4]

82. The settlement agreement sought to address the COUNTY's unconstitutional patterns and practices of providing inmates constitutionally deficient mental health care for inmates, including inadequate suicide prevention practices.

83. The Department of Justice requested District Court oversight of the comprehensive reforms agreed to in the settlement agreement. Specific to mental health issues, the reforms were designed to prevent and respond more effectively to suicides and self-inflicted injuries through the following measures:

a. additional steps to recognize, assess and treat inmates with mental illness, from intake to discharge;

b. significant new training on crisis intervention and interacting with inmates with mental illness for new and existing custody staff;

---

[3] *See United States of America v. County of Los Angeles and Los Angeles County Sheriff Jim McDonnell*, United States District Court, Central District of California, Case No. 15-5903, Docket No. 1, filed August 5, 2015.

[4] *See* United States Department of Justice Press Release: "Justice Department Reaches Agreement with Los Angeles County to Implement Sweeping Reforms on Mental Health Care and Use of Force Throughout the County Jail System," August 5, 2015, available at https://www.justice.gov/opa/pr/justice-department-reaches-agreement-los-angeles-county-implement-sweeping-reforms-mental

19

**COMPLAINT FOR DAMAGES**

     c.  improved documentation in inmates' medical and mental health records to ensure continuity of care;

     d.  improved communication between custody and mental health staff and increased supervision of mentally ill and suicidal inmates;

     e.  steps to mitigate suicide risks within the jails;

     f.  increased access to out-of-cell time for mentally ill inmates; and

     g.  improved investigation and critical self-analysis of suicides, suicide attempts and other critical events.

84.    Prior to the 2015 Settlement Agreement, there existed a culture of indifference towards inmates at the COUNTY Jails, particularly those inmates who struggled with mental health issues.  This culture of indifference dated back for decades:

     h.  In June 1996, the Department of Justice notified the COUNTY OF LOS ANGELES and Sheriff that it was opening an investigation under CRIPA, 42 U.S.C. § 1997, to determine whether the conditions in the Jails violate the constitutional rights of its inmates.

     i.  In September 1997, the Department of Justice issued a findings letter alleging that mental health care at the COUNTY Jails violated inmates' constitutional rights. The letter further alleged that systemic deficiencies contributed to the violations, including inadequate: (1) intake screening and evaluation, (2) diagnosis, (3) referral to mental health professionals, (4) treatment plans, (5) administration of medications, (6) suicide prevention, (7) tracking and medical record keeping, (8) staffing, (9) communication, and (10) quality assurance.

     j.  In December 2002, following extensive negotiations and additional site visits, the Parties entered into a Memorandum of Agreement ("MOA") that outlined a series of reforms to ensure that adequate and reasonable mental health care services are provided at the Jails. The MOA also included measures to protect inmates with mental illness from abuse and mistreatment.

**COMPLAINT FOR DAMAGES**

k. Under the MOA, the Department of Justice recognized that the COUNTY OF LOS ANGELES and the Sheriff made improvements to the delivery of mental health care at the COUNTY Jails; however, systemic deficiencies remained related to suicide prevention and mental health care that violated inmates' constitutional rights. The Department of Justice notified the COUNTY OF LOS ANGELES and the Sheriff of these conclusions in a letter dated June 4, 2014, following on-site evaluations with expert consultants.

l. In September 2013, the Department of Justice opened a separate investigation of the Jails under CRIPA and 42 U.S.C. §14141 ("Section 14141") to address allegations of use of excessive force against all inmates at the Jails, not just inmates with mental illness.

m. The investigations revealed the following: "Defendants have repeatedly failed to take reasonable measures to protect prisoners against the serious harm from suicide and self-harm due to, but not limited to: ( 1) inadequate suicide prevention measures; (2) lack of appropriate screening by custody and mental health staff to assess suicide risk; (3) lack of appropriate supervision, observation, and monitoring of prisoners, including those identified as at risk of suicide; (4) inadequate communication between mental health care and custody staff; (5) lack of appropriate multi-disciplinary treatment plans; and (6) an inadequate suicide or critical incident review process. Defendants have repeatedly failed to provide adequate mental health services, including psychological and psychiatric services, to prisoners with serious psychiatric needs that are known or obvious due to, but not limited to, insufficient and inadequate: (1) in-patient care for those in need; (2) crisis intervention; (3) therapy, clinical contacts, and group programming; (4) treatment and referrals for

21

**COMPLAINT FOR DAMAGES**

prisoners in general population; (5) medication administration practices, including treatment to prisoners refusing medication; and (6) discharge planning."[5]

85. As a result of these investigative findings, the Department of Justice filed the *USA v. County of Los Angeles, et al*. lawsuit in August of 2015.

**B. Defendant Supervisors Had Knowledge of Inadequacy and Delivery of Mental Health Care at the Los Angeles County Jails and Failed to Take Corrective Action.**

86. Prior to September 22, 2023, high level COUNTY supervisors, including SHERIFF LUNA and SHERIFF ALOMA, knew or should have known of a history of years of notice of ongoing failure to provide inmates indicated and timely reasonable medical/mental health care, knew or should have known of inadequate and/or incompetent staffing, insufficient and inadequate cells and beds, incompetent and inadequate provision of health care and delivery thereof, denying access to outside hospitals or other mental health programs, failure to take corrective measures, including ignoring judicial orders to abate or take corrective action regarding medical and mental health care to pretrial detainees, notice from quality assurance and death reviews, from litigation alleging failure to provide reasonable medical and mental health care, and from publications of endemic, ongoing and unabated risks of injury or death to inmates. The number of lawsuits against the COUNTY and throughout the state and the evidence available from those actions is troubling and demonstrative of Defendants' years of deliberate indifference to known ongoing hazards to ill detainees and their failure to take corrective action.

87. As a preamble, between 2018 and 2023, the COUNTY had notice of a slew of cases revealing constitutional violations of inmates' rights to reasonable medical care. Due diligence would have revealed these breaches of constitutional mandates:

88. Since 2023, Defendant COUNTY OF LOS ANGELES' correctional facilities, including the LOS ANGELES COUNTY SHERIFF'S DEPARTMENT's Twin Towers Correctional Facility, Men's Central Jail, Century Regional Detention Facility, Inmate Reception

---

[5] *See United States of America v. County of Los Angeles and Los Angeles County Sheriff Jim McDonnell*, United States District Court, Central District of California, Case No. 15-5903, Docket No. 1 at parags. 22-23, filed August 5, 2015.

**COMPLAINT FOR DAMAGES**

Center and the Pitchess Detention Facilities (hereinafter collectively "COUNTY Jails"), have harbored in excess of fifty-seven (57) in-custody deaths. Many of these deaths involve suicide.

89.    MAXWELL AGUIRRE's death is one of numerous suicide deaths within the COUNTY Jails during the 2023 calendar year.

90.    The Defendants' deliberate indifference towards pretrial detainees suffering from mental health issues resulted in several suicides since 2018. From January 2018 through September 2023, greater than twenty-six (26) inmates have died by suicide within the COUNTY jails:

91.    In 2018, Daniel Arteaga, a 27-year-old male, committed suicide while in-custody at the TTCF by hanging himself in his cell. Mr. Arteaga was on suicide watch due to his history of bipolar disorder and schizophrenia. On January 22, 2018, Mr. Arteaga was found in his cell suspended between the wall and bunkbed with his chin resting on the top bunk. It is estimated that Mr. Arteaga was hanging for approximately 15-20 minutes. The entire incident was captured on video surveillance. Mr. Arteaga was pronounced brain dead at the hospital four days after being transported from the COUNTY jail in cardiac arrest. Mr. Arteaga had only been incarcerated for approximately three weeks prior to his death.

92.    In 2018, Steven Thach was found alone and unresponsive in his cell from an apparent suicide. Mr. Thach was only 24 years old at the time of his death. Mr. Thach had a known history of schizophrenia. Mr. Thach was not found unresponsive until after custodial staff delivered snacks to inmates in their cells on March 28, 2023. Mr. Thach was observed to be sitting down with a mattress cover wrapped around his neck and the rail of his bunkbed. He was pronounced dead at the scene.

93.    In 2018, Alberd Tersargyan committed suicide while in-custody at the COUNTY Jail by hanging himself with a trash bag. Mr. Tersargyan was 81 years old at the time of his death. He had been incarcerated since 2010. Upon arrest, Mr. Tersargyan was placed on suicide watch. On April 1, 2018, Mr. Tersargyan was found unresponsive in his cell during an inmate check. He was subsequently transported to the hospital in cardiac arrest. Mr. Tersargyan was pronounced dead at the hospital later that evening.

**COMPLAINT FOR DAMAGES**

94.     In 2018, Lewis Nyarecha committed suicide while in-custody at the TTCF. Mr. Nyarecha was a 25-year-old pretrial detainee who had been in-custody at the COUNTY jail for less than one month prior to his death. On August 28, 2018, Mr. Nyarecha was found unresponsive in his cell in a rigor mortis state which was indicative of a muscle spasm likely induced by his ingestion of quetiapine, a medication commonly used to treat schizophrenia. According to the COUNTY's autopsy report, the level of quetiapine found in Mr. Nyarecha was nearly three times the lethal level. Mr. Nyarecha was pronounced dead at the scene.

95.     In 2018, pretrial detainee Rufino Paredes committed suicide while in-custody. On December 5, 2018, Mr. Paredes was initially found face down with a sheet tied around his neck and the other end of the sheet attached to the bottom bar of his cell door. Mr. Paredes was 30 years old at the time of his death. He had a history of mental illness specifically depression. He had been incarcerated for less than 24 hours prior to his death. Mr. Paredes was pronounced dead at the scene despite resuscitative efforts.

96.     In 2019, Thomas Banuelos, a 30-year-old male, committed suicide while in-custody at the COUNTY jail. On March 15, 2019, Mr. Banuelos was found in his cell hanging from his bunkbed with a sheet wrapped around his neck. It is estimated that Mr. Banuelos was on the floor unresponsive for approximately 30 minutes. Mr. Banuelos was transported to the hospital where he was later pronounced dead.  Mr. Banuelos had been incarcerated for less than two weeks prior to his death.

97.     In 2019, pretrial detainee Jeffrey Barnett died while in-custody at the TTCF due to an apparent suicide. Mr. Barnett was 53 years old at the time of his death. On April 8, 2019, Mr. Barnett was found hanging and partially suspended in his cell with ligature marks around his neck. Multiple suicide notes were found in Mr. Barnett's cell that were written over approximately a one-week period.

98.     In 2019, Cody Jones, a 25-year-old male, committed suicide while in-custody at the COUNTY Jail. On June 21, 2019, Mr. Jones was found hanging from his jail cell door, approximately 4 feet above the ground, with a bedsheet around his neck that was tightly braided.

**COMPLAINT FOR DAMAGES**

Mr. Jones was transported to the hospital where he was subsequently pronounced dead. However, Mr. Jones's father had also committed suicide when Mr. Jones was a child.

99.     In 2019, Patrick Clancy passed away in a nursing home after being placed on hospice care. Approximately one year prior, Mr. Clancy was found hanging in his cell while in custody at the TTCF. Mr. Clancy was initially transported to the hospital where he was placed on a ventilator and never regained consciousness. While at Twin Towers, Mr. Clancy was in a mental health unit. He had been incarcerated for only three days prior to his suicide. Mr. Clancy was 59 years old at the time of his death on November 19, 2019.

100.     In 2020, Michael Zivalich, a 31-year-old male, committed suicide while in-custody at the COUNTY jail. On July 19, 2020, Mr. Zivalich was found hanging from his bunkbed with a bedsheet tied around his neck. Mr. Zivalich had a known history of depression and attention deficit disorder. He had also made prior statements that if he was ever incarcerated again, he would kill himself. Mr. Zivalich had a court hearing the day prior to his suicide in which he was informed he would be facing a prison sentence of five years. Despite this, Mr. Zivalich was not on Suicide Watch. Mr. Zivalich had been incarcerated for only three days prior to his death.

101.     In 2020, Roberto Escobar attempted suicide while in-custody at the Twin Towers Correctional Facility by jumping from his jail cell bed. Mr. Escobar's jump was approximately 6 feet from the ground. Mr. Escobar was found unresponsive by another inmate and not custodial staff. As a result of the incident, Mr. Escobar suffered multiple blunt force injuries to his head and neck. On November 18, 2020, Mr. Escobar succumbed to these injuries after being hospitalized for approximately one month. Mr. Escobar had a known history of depression, schizophrenia, suicidal ideations and prior suicide attempts. Mr. Escobar's suicide attempt was initially reported as a "fall" but later determined to be an intentional jump. Mr. Escobar informed hospital staff that he had intended to end his own life by jumping off his bed headfirst without extending his hands. Mr. Escobar was 41 years old at the time of his death.

102.     In 2020, Vincent Nelson committed suicide at MCJ. On December 18, 2020, Mr. Nelson was found hanging in his cell.  Mr. Nelson was transported to the LAC/USC Medical Center where he was diagnosed with an anoxic brain injury.  Four days later, Mr. Nelson succumbed to his

**COMPLAINT FOR DAMAGES**

injuries and died on December 22, 2020.  Mr. Nelson had a history of depression and suicidal ideation.   Mr. Nelson was 27 years old at the time of his death.

103.    In 2021, Lorenzo Anguino committed suicide at MCJ by removing his tracheostomy tube.  Mr. Anguino had a history of suicide attempts and indeed attempted suicide three different times at MCJ; the first attempt was by cutting his wrists and the two other attempts were by removing his tracheostomy tube.  On January 7, 2021, inmates informed LASD custody staff that Mr. Anguino was attempting suicide by removing his tracheostomy tube and inserting Q-tips into his airway.  The very next day, Mr. Anguino once again removed his tracheostomy tube and inserted Q-tips into his airway to commit suicide.  Mr. Anguino was pronounced dead on January 8, 2021.  The mechanism of death was asphyxiation (i.e., choking) and the manner of death was suicide.  Mr. Anguino was 27 years old at the time of his death.

104.    In 2021, Mark Carrillo committed suicide at MCJ. Mr. Carrillo had been housed at MCJ for a month prior to committing suicide.  During that month, Mr. Carillo engaged in alarming behavior which caused him to be housed in a single-man cell.  On January 23, 2021, Mr. Carillo was found hanging from a ligature that was fastened to the bars of his cell door.[6]  The ligature Mr. Carillo created was made out of a t-shirt and a sock that were tied together by a large knot.  Mr. Carillo was 38 years old at the time of his death.

105.    In 2021, Donry Bernabe committed suicide at LASD station jail.  On February 16, 2021, Mr. Barnabe was arrested by LASD sheriff's deputies and booked at the LASD Palmdale Station Jail.  Hours later, an inmate observed Mr. Bernabe praying on his knees as he faced his cell wall.  Mr. Bernabe then found hanging by a ligature tied to the telephone box inside his cell. Mr. Bernabe was 50 years old at the time of his death.

---

[6] Notably, the suicide was captured on surveillance video.  The surveillance camera captured Mr. Carillo's hands and fingers fidgeting through the bars, appearing consistent with Mr. Carillo tying a ligature to accomplish suicide by strangulation. To date, it remains unclear as to why LASD custody staff and/or CHS medical staff failed to notice Mr. Carillo's hands and fingers fastening the ligature on the cell bars which served as the attachment points.

26

**COMPLAINT FOR DAMAGES**

106.    In 2021, Wilson Barrios committed suicide at MCJ. On February 27, 2021, Mr. Barrios was found hanging in his cell by a sheet tied to rail.[7] Mr. Barrios was transported to the LAC/USC Medical Center where he was diagnosed with global brain damage from anoxia.  Three weeks following the suicide attempt, Mr. Barrios succumbed to his injuries and died on March 20, 2021.  Mr. Barrios had a history of suicide attempts as evidenced by the very visible self-harm wounds on his body.  It was further known to the LASD custody staff and CHS medical staff that Mr. Barrios was a victim of numerous altercations. In fact, Mr. Barrios was physically assaulted hours prior to his final suicide attempt.   Mr. Barrios was 26 years old at the time of his death.

107.    In 2021, Angel Sapien committed suicide at MCJ. On March 12, 2021, Mr. Sapien was found in his cell unresponsive, seated on his bunk with a ligature formed around his neck and tied to the jail cell's bunk bed frame.  The ligature was formed by tying plastic material together.  The plastic material was believed to be plastic bags.  Mr. Sapien was 34 years old at the time of his death.

108.    In 2021, Sam Do committed suicide at TTCF, specifically within the HOH Unit.[8] Mr. Do had been in the LASD's custody since January 2020.  On May 17, 2021, Mr. Do was found dead in his cell with a plastic bag over his head.  LASD custody staff provided Mr. Do with the plastic bag an hour prior to his death; the plastic bag contained Mr. Do's snack and medications. Mr. Do was 43 years old at the time of his death.

109.    In 2021, Darlene Carlisle committed suicide at the LASD Lynwood Jail.  Ms. Carlisle had a history of depression and suicide attempts.  On May 20, 2021, Ms. Carlisle was found in her cell with an elastic tied in a loop around her neck and with a sanitary towel lodged deeply into her airway.  A month prior, Ms. Carlisle had been taken off of Suicide Watch by CHS medical

---

[7] This suicide attempt was *also* captured on surveillance video.  To date, it remains unclear as to why LASD custody staff and/or CHS medical staff failed to notice Mr. Barrios' fastening the sheet on the rail as he performed the act of strangulation *on video*.

[8] Despite the fact that the "HOH Unit" is indeed the *High Observation* housing module for inmates who struggle with mental health issues, it is unclear why no LASD custody staffer nor CHS mental health staffer *observed* Mr. Do committing suicide by suffocating himself with plastic bag around his head.

27

**COMPLAINT FOR DAMAGES**

staff following a suicide attempt involving Ms. Carlisle cutting her wrists. Ms. Carlisle was 58 years old at the time of her death.

110.    In 2021, Alejandro Esparza committed suicide at TTCF. Mr. Esparza had a history of hearing voices, paranoia, and suicidal ideations. Due to his severe mental health issues, Mr. Esparza was transferred from MCJ to TTCF, specifically within the "High Observation" housing module. On May 21, 2021, Mr. Esparza notified the LASD custody staff and/or the CHS mental health staff about his suicidal ideations and even shared with them that he had previously attempted suicide with a towel around his neck.  Later that evening, and approximately from 11:27 p.m. to 11:47 p.m., Mr. Esparza forcefully banged his head against the wall of his single-man cell 61 times.[9]  The following morning Mr. Esparza was found unresponsive in his cell.  Mr. Esparza's forehead and nose bridge had visible swelling with purple skin discoloration.  His eye sockets also had visible bruising.  Mr. Esparza died of blunt force trauma to the head.  Mr. Esparza was only 23 years old at the time of his death.

111.    In 2021, Aaron Crawford committed suicide at TTCF.  More specifically, Mr. Crawford committed suicide on December 27, 2021 *within* the Mental Evaluation & Suicide Watch Unit.  Mr. Crawford had been in the LASD custody since July 4, 2018.  Mr. Crawford had been in the Suicide Watch unit for *eight whole months* from April 29, 2021 until finally ending his life on December 27, 2021.  The LASC custody staff and CHS mental health staff were well aware that Mr. Crawford was *acutely* suicidal and would have been better served at a psychiatric hospital rather than a correctional facility.  Indeed, Mr. Crawford accomplished suicide on December 27, 2021 by ingesting a lethal amount of prescription drugs he had hoarded during pill call; these pills included quetiapine, buspirone, diphenhydramine, sertraline.  Notably, the LASD custody staff and CHS mental health staff knew that Mr. Crawford had attempted suicide on numerous occasions while in the LASD custody, including attempts by way of cutting his arms and hoarding pills.

---

[9] Video surveillance showed Mr. Esparza forcefully banging his head against the cell wall over the span of 10 minutes. LASD Sgt. Shrout counted "61 head bangs" when reviewing the footage.  Here too it remains unclear how a 23-year-old inmate could forcefully bang his head against a wall in his jail cell 61 times over a span of 10 minutes within the *High Observation* unit.

28

**COMPLAINT FOR DAMAGES**

Handwritten suicide notes were found in his cell.  Mr. Crawford was 36 years old at the time of his death.

112.    In 2022, Winford Carter, a 36-year-old male, was found unresponsive and face down in his cell approximately one week after being booked at TTCF. Upon booking, Mr. Carter was placed alone in a cell in the High Observation Housing Unit at Twin Towers due to his history of mental illness. Mr. Carter was diagnosed with schizoaffective disorder and paranoid schizophrenia. According to the Deputy Medical Examiner and autopsy report, the "stress of being placed in custody exacerbated [Mr. Carter's] mental condition." At the time of his death, Mr. Carter's cell was observed to be flooded with approximately two (2) inches of "murky" water which contained fecal matter. In addition to this, the inside of Mr. Carter's cell had smeared fecal matter on the walls as well as "indistinguishable writing." The COUNTY's Medical Examiner determined Mr. Carter's mechanism of death was asphyxia after ingesting a large bolus of paper which completely obstructed his airways.

113.    In 2022, Joseph Posard committed suicide in the hospital dormitory of the Twin Towers Correctional Facility.  Mr. Posard was housed alone in a hospital dormitory that contained suicide hazards, including electrical cords and showers heads.  Mr. Posard committed suicide on December 10, 2022 by way of strangulation.  Indeed, the LASD custody staff and CHS medical staff were aware of Mr. Posard's suicidal propensities given his three-month incarceration at the COUNTY Jails just six weeks prior, including his placement on Suicide Watch.

114.    In 2023, Massimo Barbagallo committed suicide while in-custody at the COUNTY Jail by climbing up a wall and jumping off headfirst. Mr. Barbagallo's jump was approximately 25 feet from the ground. As a result of the incident, Mr. Barbagallo suffered multiple blunt force injuries to his head, neck, torso and extremities. He succumbed to these injuries and died on January 16, 2023. The entire incident was captured on video surveillance. On the date of his death, Mr. Barbagallo was issued a pass to get a book at the inmate services area. Mr. Barbagallo had been incarcerated for nearly three and a half years prior to his death.

115.    In 2023, Eric Wright committed suicide at the LASD jail.  On March 22, 2023, Mr. Wright was found hanging in his cell on.  He was then transported to Cedars Sina Hospital where he

**COMPLAINT FOR DAMAGES**

was diagnosed with an anoxic brain injury.  Mr. Wright succumbed to his injuries and died on March 25, 2023.

116.   In September 2023, Maxwell Aguirre committed suicide at TTCF.  The 22-year-old pretrial detainee committed suicide while the floor deputies, who were responsible for conducting safety checks, watched YouTube videos instead of performing their duties.  That day, the floor deputies failed to perform mandatory welfare checks around the time that the 22-year-old inmate committed suicide.[10]  Notably, Mr. Aguirre had previously attempted suicide earlier that month while in custody.

**C.  The County Defendants' Indifference to the Constitutional Violations and Failures Permeating the COUNTY Jails Affecting Inmates with Mental Health Issues.**

117.   Defendants SHERIFF LUNA, SHERIFF ALOMA, and ROCIO DELGADO through their supervision of the COUNTY's medical staff, were responsible for the provision of medical and mental health services at the COUNTY Jails, and as such, were responsible for the following at the COUNTY Jails:

   a.   Staffing for the jail's medical and mental health units;

   b.   Administrative structure, medical direction and operational oversight for the medical and mental health units;

   c.   Oversight of the day-to-day operations of the health services programs at the jail;

   d.   Design and implementation of a suicide prevention program, including the related policies and procedures to fully and safely carry out such program;

   e.   Development, implementation and revision policies and procedures which relate to the overall provision of mental health and medical services, including the operational aspects of such services and compliance with regulations and statutes;

   f.   Development, implementation and revision policies, procedures and practices for the training of custody, medical and mental health staff at the jail;

---

[10] *See* "A Man Died By Suicide at Twin Towers While Guards Allegedly Watched Videos" (Los Angeles Public Access, October 21, 2023), available at https://lapublicpress.org/2023/10/a-man-hanged-himself-at-twin-towers-so-lasd-restricted-video-streaming/

**COMPLAINT FOR DAMAGES**

g. Identifying of all unsafe or unhealthy conditions within the jail facilities related to the provision of medical and mental health services, and proposing of corrective measures of such conditions in a timely manner;

h. Provide continuous training to detention staff regarding the screening of inmates, identification of mentally ill inmates, risk recognition, and suicide prevention.

118. Defendants COUNTY, LASD, SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and the COUNTY custody, medical and mental health staff, and each of them, had been on notice for years that their provision of medical and mental health treatment to inmates at the COUNTY Jails was inadequate and resulted in needless harm and death.

119. By the time that decedent MAXWELL AGUIRRE was moved to TTCF, and housed alone within the veterans dormitory, SHERIFF ALOMA, SHERIFF LUNA, ROCIO DELGADO, and the COUNTY custody, medical and mental health staff, and each of them, understood the dormitory where Mr. Aguirre was housed on September 22, 2023 was not suitable for an inmate who exhibited clear signs of psychosis and suicidal ideations because the jail cell contained suicide hazards and was unreasonably dangerous for housing inmates with identified mental health concerns and a history of a suicide attempt while in COUNTY custody *that same month*.

120. Defendants COUNTY, LASD, LACDHS, SHERIFF ALOMA, SHERIFF LUNA, ROCIO DELGADO, and the COUNTY custody, medical and mental health staff, and each of them, knew that placing decedent MAXWELL AGUIRRE in such a dormitory would pose a substantial risk of death. Prior to the death of decedent MAXWELL AGUIRRE, other persons in the custody of the COUNTY and supervised and cared for by the COUNTY medical and custody staff had attempted suicide by similar, if not identical, means during their incarcerations at the COUNTY Jails.

121. Defendants COUNTY, LASD, LACDHS, SHERIFF ALOMA, SHERIFF LUNA, ROCIO DELGADO, and the COUNTY custody, medical and mental health staff, and each of them, knew that Maxwell Aguirre had attempted suicide by toxic ingestion of Seroquel pills on September 3, 2023.

31

**COMPLAINT FOR DAMAGES**

122.    Defendants COUNTY, LASD, LACDHS, ROCIO DELGADO, SHERIFF LUNA and SHERIFF ALOMA, and the COUNTY custody, medical and mental health staff, and each of them, were repeatedly put on notice of the great dangers which existed within the COUNTY Jails through the long history of in-custody deaths; the federal civil rights action *United States of America v. County of Los Angeles and Los Angeles County Sheriff Jim McDonnell*, United States District Court, Central District of California, Case No. 15-5903 targeting the COUNTY Jails' custody and medical staff's deliberate indifference to the safety and protection of inmates, particularly those who were at risk of suicide; the warnings from neutrally-selected experts regarding the COUNTY Jails' custody and medical staff's failures amounting to constitutional violations; the U.S. Department of Justice's request for federal court oversight of comprehensive reforms designed to prevent and respond more effectively to suicides and self-inflicted injuries; and through a voluntarily entered Settlement Agreement which required that the COUNTY OF LOS ANGELES and the LOS ANGELES COUNTY SHERIFF'S DEPARTMENT remedy all of the deficiencies addressed in the *United States of America v. County of Los Angeles and Los Angeles County Sheriff Jim McDonnell* federal civil rights action.

123.    Based on the aforementioned, Defendants COUNTY, LASD, LACDHS, SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and the COUNTY custody, medical and mental health staff, and each of them, knew of the dangers that posed a risk to decedent MAXWELL AGUIRRE's safety, yet disregarded these dangers resulting in his death.

**VII.**

**PUNITIVE/EXEMPLARY DAMAGES ALLEGATIONS**

**(Against SHERIFF ROBERT LUNA, SHERIFF SERGIO ALOMA, ROCIO DELGADO, REGISTERED NURSE GALEON, COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES, and Does 1-50)**

124.    Each Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice.

32

**COMPLAINT FOR DAMAGES**

125.    Long before MAXWELL AGUIRRE's death, Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 1 through 50 knew that there existed a great indifference to the safety and protection of the inmates who were in the government's custody within the COUNTY Jails.

126.    Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO and DOES 1 through 50 were repeatedly put on notice of the great dangers which existed within the COUNTY Jails through the long history of in-custody deaths, as detailed in Section VI above.

127.    Despite this long history of complete disregard to inmate safety and protection, Defendants SHERIFF LUNA, SHERIFF ALOMA, and ROCIO DELGADO have deliberately failed to take even modest actions to prevent in-custody deaths at the COUNTY Jails which have for a very long time been infested with endemic, ongoing and unabated risks of injury or death to inmates.

128.    The Defendant officers, and each of them, acted with malice and oppression and with a conscious disregard for Plaintiffs' rights, making the individual defendants, including DOES 1-50, liable for punitive damages.

129.    The tortious, extreme, and outrageous conduct of REGISTERED NURSE GALEON in misleading plaintiffs about Maxwell Aguirre being in "stable condition" qualifies him as liable for punitive damages.

130.    The tortious, extreme, and outrageous conduct of COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES in denying Maxwell Aguirre end of life access to his pastor Dr. Mike Stephen (Lifeway Church) and access to his private attorney Brian Hurwitz constituted first amendment violations.

## VIII.

## FIRST CAUSE OF ACTION

**Failure to Protect from Harm,**

**Violation of the Fourteenth Amendment to the United States Constitution**

33

COMPLAINT FOR DAMAGES

**(Survival Action – 42 U.S.C. § 1983)**

**By Plaintiff Estate of MAXWELL AGUIRRE As Against SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO, and DOES 1 through 50**

131.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

132.    Defendants COUNTY, LASD and DOES 1 through 50 were on notice that their deficient policies, procedures, and practices alleged herein created substantial risk of serious harm to an inmate in decedent MAXWELL AGUIRRE's position.

133.    Each Defendant could have taken action to prevent unnecessary harm to decedent MAXWELL AGUIRRE but refused or failed to do so.

134.    By policy, procedure, and practice, Defendants COUNTY, LASD and DOES 1 through 50 deliberately disregarded the hazards and risks posed to persons incarcerated at the TTCF, as alleged above.  Defendants failed to take any reasonable steps to mitigate the obvious and well-known risks of harm that was attendant to housing decedent MAXWELL AGUIRRE at TTCF.

135.    Indeed, on September 22, 2023, Defendants DOES 1 through 50, and each of them, made the intentional decision of refusing to place MAXWELL AGUIRRE in a safety cell or a cell free of suicide hazard. Defendants DOES 1 through 50, and each of them, further made the intentional decision of placing MAXWELL AGUIRRE in a dormitory which was full of suicide hazards and weapons of death for a person who is suicidal.

136.    Clearly, given that MAXWELL AGUIRRE was suicidal, placing him in a dormitory filled with suicide hazards put MAXWELL AGUIRRE at substantial risk of suffering serious harm to which Defendants DOES 1 through 50, and each of them, did not take reasonable measures to reduce such risk even though any reasonable person would have appreciated the high risks involved in the situation. By failing to take such reasonable measures, it was obvious and foreseeable that MAXWELL AGUIRRE would commit suicide. Therefore, by not taking such measures, Defendants DOES 1 through 50, and each of them, caused MAXWELL AGUIRRE's death.

**COMPLAINT FOR DAMAGES**

137.   Defendants COUNTY, LASD and DOES 1 through 50 were on notice that their policies, procedures, and practices for monitoring inmates at the COUNTY Jails, including TTCF, were inadequate and gave rise to a substantial risk of serious harm.

138.   Defendants, including SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50, knew that deputies routinely failed to conduct required welfare and safety checks at the COUNTY Jails, including TTCF, and failed to take sufficient actions to correct this problem and ensure that necessary checks were performed.

139.   Defendants, including SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50, knew that deputies were absconding their duties by watching Youtube videos and other media/social media instead of overseeing inmates, including inmates with heightened suicide risk.

140.   Defendants, including SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50, failed to take corrective action, discipline, or remove the command staff at the COUNTY Jails, including TTCF, who, upon information and belief, directed the deputies to falsify safety check logs and violate the COUNTY's safety check policies. Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50 ratified their actions, and the practices used under their watch.

141.   Defendants, including SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50, failed to properly train and supervise LASD custody, medical and mental health staff regarding policies, procedures, and practices necessary for the protection of inmates from risks and hazards existing within the COUNTY Jails, including TTCF.

142.   Defendants, including SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50, failed to correct their policies, procedures, and practices despite notice of significant and dangerous problems evidences deliberate indifference to the inmates in their care.

143.   Defendants, including SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO and DOES 41 through 50, ratified Defendants DOES's actions and inactions amounting to constitutional violations.

**COMPLAINT FOR DAMAGES**

144.    Defendants DOES 1 through 50's failure to conduct the required safety check of decedent MAXWELL AGUIRRE's housing unit on the date of his death evidences deliberate indifference to the risk of harm to decedent MAXWELL AGUIRRE.

145.    Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO and DOES 41 through 50 ratified Defendants DOES's failure to conduct safety checks and falsification of logs.

146.    As a direct and proximate result of Defendants' conduct, the civil rights of MAXWELL AGUIRRE, as protected by the Fourteenth Amendment of the United States Constitution were violated.  Further, decedent MAXWELL AGUIRRE experienced physical pain, severe emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

147.    Defendants subjected decedent MAXWELL AGUIRRE to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent and others would be violated by their acts and/or omissions.

148.    As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Decedent, through Plaintiffs herein, sustained injuries and damages.

149.    The conduct of Defendants entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiff does not seek punitive damages against Defendants COUNTY for this cause of action.

150.    Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

**IX.**

**SECOND CAUSE OF ACTION**

**Failure to Provide Medical Care,**

**Violation of the Fourteenth Amendment to the United States Constitution**

**(Survival Action – 42 U.S.C. § 1983)**

36

**COMPLAINT FOR DAMAGES**

**By Plaintiff Estate of MAXWELL AGUIRRE As Against SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO, and DOES 1 through 50**

151. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

152. By the actions and omissions described above, Defendants SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO and DOES 1 through 50, as alleged herein, violated 42 U.S.C. § 1983, depriving decedent MAXWELL AGUIRRE, through Plaintiffs herein, of the following clearly established and well-settled constitutional rights protected by the Fourteenth Amendment to the United States Constitution: Decedent's right to be free from deliberate indifference to MAXWELL AGUIRRE's serious medical and mental health needs while in custody as a pretrial detainee as secured by the Fourteenth Amendment.

153. By the actions and omissions described above, Defendants SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO and DOES 1 through 50, as alleged herein, including but not limited to their failure to provide decedent MAXWELL AGUIRRE with appropriate emergency medical and mental health care, along with the acts and/or omissions of Defendants in failing to train, supervise, and/or promulgate appropriate policies and procedures to provide emergency medical and mental health care and life saving care to persons in their custody, constituted deliberate indifference to MAXWELL AGUIRRE's serious medical and mental health needs, health, and safety.

154. Indeed, in September 2023, Defendants SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO and DOES 1 through 50, and each of them, made the intentional decision of to deny MAXWELL AGUIRRE the proper medical treatment and observation for his suicidal symptoms. Any reasonable person in Defendants SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO and DOES 1 through 50's position would have known that MAXWELL AGUIRRE was suicidal, *inter alia, given the documented suicide attempt by toxic ingestion of Seroquel pills on September 3, 2023.*

37

**COMPLAINT FOR DAMAGES**

155. Instead of providing MAXWELL AGUIRRE with the medical care he needed, Defendants DOES 1 through 50, and each of them, denied MAXWELL AGUIRRE medical care and put him in substantial risk of suffering serious harm.

156. Clearly, given that MAXWELL AGUIRRE was suicidal, Defendants SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO and DOES 1 through 50, and each of them, did not take reasonable measures to reduce such risk even though any reasonable person would have appreciated the high risks involved in the situation. By failing to take such reasonable measures, it was obvious and foreseeable that MAXWELL AGUIRRE would commit suicide. Therefore, by not taking such measures, Defendants DOES 1 through 50, and each of them, caused MAXWELL AGUIRRE's death.

157. As a direct and proximate result of Defendants' conduct, the civil rights of MAXWELL AGUIRRE, as protected by the Fourteenth Amendment of the United States Constitution were violated.  Further, decedent MAXWELL AGUIRRE experienced physical pain, severe emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

158. Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent and others would be violated by their acts and/or omissions.

159. As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Decedent, through Plaintiff herein, sustained injuries and damages.

160. The conduct of Defendants entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiff does not seek punitive damages against Defendants COUNTY for this cause of action.

161. Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

**X.**

38

**COMPLAINT FOR DAMAGES**

**THIRD CAUSE OF ACTION**

**Deprivation of the Right to Familial Relationship with Decedent,**

**Violation of the Fourteenth Amendment to the United States Constitution**

**(42 U.S.C. § 1983)**

**By Plaintiffs OMAR AGUIRRE and YVETTE AGUIRRE As Against SERGIO**

**ALOMA, ROBERT LUNA, ROCIO DELGADO, and DOES 1 through 50**

162.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

163.    The aforementioned acts and/or omissions of Defendants SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO, and DOES 1 through 50 in being deliberately indifferent to decedent MAXWELL AGUIRRE's protection, safety, and serious medical and mental health needs, violating decedent MAXWELL AGUIRRE's constitutional rights, and their failure to train, supervise, and/or take other appropriate measures to prevent the acts and/or omissions that caused the untimely and wrongful death of MAXWELL AGUIRRE deprived Plaintiffs OMAR AGUIRRE and YVETTE AGUIRRE of their liberty interests in the parent-child relationship in violation of their substantive due process rights as defined by the Fourteenth Amendment of the Constitution.

164.    All of the acts of Defendants SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO, and DOES 1 through 50 and the persons involved were done under color of state law.

165.    The acts and omissions of each Defendant deprived Plaintiffs OMAR AGUIRRE and YVETTE AGUIRRE of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to the Fourteenth Amendment by, among other things, depriving Plaintiff of her rights to a parent-child relationship with decedent MAXWELL AGUIRRE without due process of law by their deliberate indifference in denying MAXWELL AGUIRRE protection and safety while incarcerated at TTCF and access to medical care while suffering a medical emergency at TTCF.

166.    The conduct of Defendants SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO, and DOES 1 through 50, and each of them, shocks the conscience because placing MAXWELL AGUIRRE in such a despicable condition, ignoring his medical condition, and

39

**COMPLAINT FOR DAMAGES**

refusing to provide medical was done with a purpose to harm unrelated to any law enforcement purpose or done with deliberate indifference. The conduct shocks the conscience in violation of the Fourteenth Amendment.

167.    Defendants SERGIO ALOMA, ROBERT LUNA, ROCIO DELGADO, and DOES 1 through 50 and the other involved agents and employees acted pursuant to expressly adopted official policies or longstanding practices or customs of the COUNTY and LASD. These include policies and longstanding practices or customs of failing to provide persons in pretrial custody who are experiencing medical emergencies access to medical care as stated above and incorporated herein.

168.    In addition, the training policies of the COUNTY and LASD were not adequate to train its deputies, agents and employees to handle the usual and recurring situations with which they must deal with, including but not limited to encounters with individuals in pretrial custody who are experiencing medical emergencies. These Defendants and each of them knew that its failure to adequately train its COUNTY custody, medical and mental health staff, including other agents and employees, to interact with individuals suffering from medical emergencies made it highly predictable that its custody, medical and mental health staff would engage in conduct that would deprive persons such as decedent MAXWELL AGUIRRE, and thus Plaintiffs OMAR AGUIRRE and YVETTE AGUIRRE, of their rights. These Defendants were thus deliberately indifferent to the obvious consequences of their failure to train their deputies, agents and employees adequately.

169.    Defendants COUNTY and LASD's official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Plaintiffs OMAR AGUIRRE and YVETTE AGUIRRE and decedent MAXWELL AGUIRRE by each individual Defendant's official policies and/or longstanding practices or customs are so closely related to MAXWELL AGUIRRE's injuries and death and thus the deprivation of the rights of Plaintiffs as to be the moving force causing those injuries.

170.    Defendants ROCIO DELGADO, SHERIFF LUNA and SHERIFF ALOMA, final policymakers for the COUNTY and LASD, ratified the actions and omissions of Defendants DOES 1 through 50, all of whom were custody, medical and mental health staff at the COUNTY Jails,

40

**COMPLAINT FOR DAMAGES**

including TTCF, in that they had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.

171.    As a direct and proximate result of Defendants' conduct, the civil rights of MAXWELL AGUIRRE, as protected by the Fourteenth Amendment of the United States Constitution were violated.  Further, decedent MAXWELL AGUIRRE experienced physical pain, severe emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

172.    Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent and others would be violated by their acts and/or omissions.

173.    As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiffs sustained injuries and damages.

174.    The conduct of Defendants entitles Plaintiffs to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiffs do not seek punitive damages against Defendants COUNTY for this cause of action.

175.    Plaintiffs are also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

## XI.

### FOURTH CAUSE OF ACTION

**Municipal Policies, Customs, Practices Causing Constitutional Violations**

(*Monell* - **42 U.S.C. § 1983**)

**By Plaintiff Estate of MAXWELL AGUIRRE As Against Defendants COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT and LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES**

176.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

41

**COMPLAINT FOR DAMAGES**

177.    At all times relevant hereto, the COUNTY custody, medical and mental health staff were required to adhere to and enforce the following policy and procedures:

a.    All COUNTY custody, medical and mental health staff must consider suicide prevention as one of the highest priorities of service within the correctional setting;

b.    All must work together to identify inmates at risk for suicide;

c.    All COUNTY custody, medical and mental health staff will have an outlined program for responding to suicidal individuals;

d.    All COUNTY custody, medical and mental health staff must learn about an inmates' high-risk periods immediately upon admission to a facility;

e.    All COUNTY custody, medical and mental health staff must learn about an inmates' high-risk periods after adjudication, when the inmate is returned to a facility from court;

f.    All COUNTY custody, medical and mental health staff must learn about an inmate's high-risk periods following the receipt of bad news regarding self or family;

g.    All COUNTY custody, medical and mental health staff must learn about an inmates' high-risk periods after suffering from some type or form of humiliation, rejection or abuse;

h.    All COUNTY custody, medical and mental health staff will review information of newly arriving inmates in this institution concerning issues related to suicide;

i.    All COUNTY custody, medical and mental health staff conducting the intake personal screen will be continuously alert to suicidal behavior;

j.    All COUNTY custody, medical and mental health staff will train their staff who work with inmates to recognize verbal and behavioral cues that indicate the potential for suicide;

k.    All COUNTY custody, medical and mental health staff who recognize an inmate as being potentially suicidal are to request immediate evaluation of the patient;

l.    All assessments of potentially suicidal inmates are to be conducted by qualified mental health professionals, trained to determine an inmate's level of suicide risk;

42

**COMPLAINT FOR DAMAGES**

m.    Inmates who have been determined to be suicidal should be placed/housed according to institutional policy and procedures for the monitoring of such individuals within the correctional setting;

n.    Regular documented supervision should be maintained;

o.    Inmates who have been determined to be suicidal should be placed/bound in the appropriate acute mental health housing;

p.    Suicidal inmates should not be housed alone, or left alone, unless constant supervision can be maintained. If constant supervision cannot be provided when needed, the inmate should be housed with another resident or in a dormitory and monitored by video camera by correctional staff;

q.    The rooms should be as nearly suicide proof as possible and constant supervision by a staff member is preferable;

r.    The procedures for referring potentially suicidal inmates and attempted suicides to mental health care providers or facilities should be clearly outlined;

s.    Clear, current and accurate information regarding an inmate must be communicated between health care personnel and correctional personnel pursuant to the procedures of communication;

t.    The intervention plan on how to handle a suicide that is in progress, including appropriate first aid measures, should be clearly outlined;

u.    Procedures for notifying correctional administrators, outside authorities and family members of potential, attempted or completed suicides will be in place;

v.    Procedures for documenting the identification and monitoring of potential or attempted suicides will be detailed, as well as procedures for reporting a completed suicide;

w.    The suicide plan should specify the procedure for medical administrative review if a suicide does occur; and

x.     A formal psychiatric/suicide review should take place following all successful suicides, or significant suicide attempts.

43

**COMPLAINT FOR DAMAGES**

178. The unconstitutional actions and/or omissions of Defendant ROCIO DELGADO and DOES 1 through 50, as well as other employees or officers employed by or acting on behalf of the Defendants COUNTY, LASD, and LACDHS on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of Defendants COUNTY, LASD, and LACDHS, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendants COUNTY, LASD, and LACDHS:

a. To deny pretrial detainees and other inmates access to timely, appropriate, competent, and necessary care for serious medical and mental health needs, requiring such inmates in crisis to remain untreated in jail instead of providing for their emergency medical needs;

b. To allow and encourage deputies doing regular cell checks on inmates, including inmates housed in safety cells and administrative segregation cells, to fail to document their actual observations of the inmate's condition and status, in violation of the COUNTY's written policies and state law;

c. To allow and encourage inadequate and incompetent medical and mental health care for jail inmates and arrestees;

d. To hire, retain and contract for obviously inadequate medical and mental health care for jail inmates and arrestees, including creating financial incentives for custody, medical and mental health staff not to send inmates with emergency medical needs to a hospital;

e. To allow, encourage, and require medical and mental health care staff, including licensed vocational nurses and registered nurses, to work outside their legal scope of practice and without appropriate supervision;

f. To fail to train custody staff that medical and mental health care staff, including licensed vocational nurses, are not competent to assess or decide inmates' medical conditions, medical needs, or whether the inmate should be permitted to remain in the jail versus being sent to a hospital;

44

**COMPLAINT FOR DAMAGES**

g.    To allow, encourage, and require unlicensed, incompetent, inadequately trained and/or inadequately supervised medical and mental health care staff to assess inmates' medical condition, needs, and treatment, including to decide whether or not to provide inmates with necessary emergency care and hospitalization, including psychiatric hospitalization;

h.    To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling persons in medical and mental health crisis;

i.    To cover up violations of constitutional rights by any or all of the following:

    i.    By failing to properly investigate and/or evaluate incidents of violations of rights, including by unconstitutional medical and mental health care at the jail;

    ii.    By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful conduct by custody, medical and mental health staff;

    iii.    By turning a blind eye to custody, medical and mental health staff who direct, aid, and/or assist with the distribution of hazards, including illicit drugs, into the COUNTY Jails; and

    iv.    By allowing, tolerating, and/or encouraging custody, medical and mental health staff to: fail to file complete and accurate reports; file false reports; make false statements; and/or obstruct or interfere with investigations of unconstitutional or unlawful conduct by withholding and/or concealing material information;

j.    To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers, COUNTY personnel, custody, medical and mental health staff at the jail whereby an officer or member of the LASD custody and/or CHS medical/mental health staff does not provide adverse information against a fellow officer, or member;

45

**COMPLAINT FOR DAMAGES**

k.    To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in subparagraphs (a) through (j) above, with deliberate indifference to the rights and safety of pretrial detainees, such as Decedent, and in the face of an obvious need for such policies, procedures, and training programs.

179.    The unconstitutional actions and/or omissions of Defendants DOES 1 through 50, as well as other officers employed by or acting on behalf of the COUNTY, LASD, and LACDHS, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of the COUNTY, LASD, and LACDHS, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officers for the COUNTY, LASD, and LACDHS, including SHERIFF LUNA and SHERIFF ALOMA:

a.    To fail to properly and adequately hire, train, supervise, and monitor custody, medical and mental health staff at the jails;

b.    To fail to use appropriate and generally accepted law enforcement procedures for handling persons in medical and mental health crisis;

c.    To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling persons in medical and mental health crisis;

d.    To cover up violations of constitutional rights by any or all of the following:

i.    By failing to properly investigate and/or evaluate complaints or incidents of handling of persons in medical and mental health crisis;

ii.    By ignoring and/or failing to properly and adequately investigate and/or discipline unconstitutional or unlawful law enforcement activity; and

iii.    By allowing, tolerating, and/or encouraging law enforcement officers to: fail to file complete and accurate reports; file false reports; make false statements; intimidate, bias and/or "coach" witnesses to give false information and/or to attempt to bolster officers' stories; and/or obstruct or interfere with

46

**COMPLAINT FOR DAMAGES**

investigations of unconstitutional or unlawful law enforcement conduct by withholding and/or concealing material information;

e. To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers whereby an officer does not provide adverse information against a fellow law enforcement officer;

f. To allow, tolerate, and/or encourage a "code of silence" among custody, medical and mental health staff at the COUNTY jails whereby custody, medical and mental health staff does not provide adverse information against one another;

g. To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in subparagraphs (a) through (f) above, with deliberate indifference to the rights and safety of pretrial detainees, such as Decedent, and in the face of an obvious need for such policies, procedures, and training programs.

180. Defendants COUNTY, LASD, and LACDHS, through their employees and agents, and through their policy-making supervisors, SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants DOES 1 through 50, and other COUNTY, LASD, and LACDHS personnel, with deliberate indifference to the constitutional rights of decedent MAXWELL AGUIRRE, Plaintiffs and others in similar positions, as described above, and therefore, those rights thereby violated.

181. The unconstitutional actions and/or omissions of Defendants DOES 1 through 50, and other COUNTY custody, medical and mental health staff, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY, LASD, and LACDHS, including Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50. Plaintiff is informed and believes and thereon alleges that the details of this incident have been revealed to the authorized policymakers within the COUNTY, LASD, and LACDHS, and that such policymakers have direct knowledge of the fact that the death of MAXWELL AGUIRRE was the result of deliberate indifference to his rights to be protected and safe while in

**COMPLAINT FOR DAMAGES**

the custody of the COUNTY/LASD, and his rights to have access to medical care when suffering a medical emergency.  Notwithstanding this knowledge, the authorized policymakers within the COUNTY, LASD, and LACDHS have approved of the conduct and decisions of Defendants DOES 1 through 50 in this matter and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the death of MAXWELL AGUIRRE. By so doing, the authorized policymakers within the COUNTY, LASD, and LACDHS have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants. Furthermore, Plaintiffs are informed and believe, and thereupon allege, that Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50, and other policy-making officers for the COUNTY, LASD, and LACDHS were and are aware of a pattern of misconduct and injury caused by COUNTY custody, medical and mental health staff similar to the conduct of Defendants described herein, but failed to discipline culpable custody, medical and mental health staff and failed to institute new procedures and policy within the COUNTY, LASD, and LACDHS.

182.    The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants COUNTY, LASD, and LACDHS were a moving force and/or a proximate cause of the deprivations of decedent Maxwell Aguirre's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983. Defendants subjected decedent MAXWELL AGUIRRE to their wrongful conduct, depriving decedent MAXWELL AGUIRRE of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of decedent MAXWELL AGUIRRE, Plaintiffs and others would be violated by their acts and/or omissions.

183.    As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants COUNTY, LASD, and LACDHS, as described above, decedent MAXWELL AGUIRRE suffered serious injuries and death, Plaintiff is entitled to damages, penalties, costs, and attorneys' fees against Defendants COUNTY and LASD.

**COMPLAINT FOR DAMAGES**

## XII.

## <u>FIFTH CAUSE OF ACTION</u>

**Supervisory Liability Causing Constitutional Violations,**

**(Failure to Properly Train, Supervise and Discipline, 42 U.S.C. § 1983)**

**By Plaintiff Estate of MAXWELL AGUIRRE As Against Defendants SHERIFF LUNA,**

**SHERIFF ALOMA, ROCIO DELGADO, and DOES 31 through 50**

184.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

185.    At all material times, SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO and DOES 31 through 50 had the duty and responsibility to constitutionally hire, train, instruct, monitor, supervise, evaluate, investigate, staff, and discipline the other Defendants employed by their respective agencies in this matter, as well as all employees and agents of the COUNTY and LASD.

186.    Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO and DOES 31 through 50 failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline the respective employees of their agencies, including Defendants DOES 1 through 50, and other COUNTY and LASD personnel, with deliberate indifference to Plaintiffs', decedent MAXWELL AGUIRRE's, and others' constitutional rights, which were thereby violated as described above.

187.    As supervisors, Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO and DOES 31 through 50 each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights to safety and protections while incarcerated at TTCF and the rights to the serious medical and mental health needs of decedent MAXWELL AGUIRRE. Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's rights, or set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known

would deprive decedent MAXWELL AGUIRRE of rights, or knew his or her subordinates were engaging in acts likely to deprive decedent MAXWELL AGUIRRE of rights and failed to act to prevent his or her subordinate from engaging in such conduct, or disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate decedent MAXWELL AGUIRRE's rights, and in fact did cause the violation of decedent MAXWELL AGUIRRE's rights. (*See*, Ninth Circuit Model Civil Jury Instruction 9.4). Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' apparent violations of decedent MAXWELL AGUIRRE' rights.

188.    Defendants ROCIO DELGADO, SHERIFF LUNA, and SHERIFF ALOMA's inaction in the training, supervision, or control of his subordinates was giving rise to many deaths in individuals in COUNTY custody. Clearly, Defendants ROCIO DELGADO, SHERIFF LUNA, and SHERIFF ALOMA were acquiescent in the many constitutional deprivations and his conduct that showed a reckless or callous indifference to the rights of inmates in COUNTY custody.

189.    The unconstitutional customs, policies, practices, and/or procedures of Defendants COUNTY and LASD, as stated herein, were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendants COUNTY and LASD, including Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO and DOES 31 through 50, respectively, with deliberate indifference to Plaintiff's, decedent MAXWELL AGUIRRE's, and others' constitutional rights, which were thereby violated as described above.

190.    The unconstitutional actions and/or omissions of Defendants DOES 1 through 50, and other COUNTY and LASD personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY and LASD, including Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50. Plaintiff is informed and believes and thereon alleges that the details of this incident have been revealed to Defendants SHERIFF LUNA, SHERIFF ALOMA, ROCIO DELGADO, and DOES 41 through 50 and that such Defendant-policymakers have direct knowledge of the fact that the death of decedent MAXWELL AGUIRRE was not justified or necessary, but represented deliberate indifference to his rights to be protected and safe while in the COUNTY's custody and his rights to his serious

50

**COMPLAINT FOR DAMAGES**

medical and mental health needs, as set forth above. Notwithstanding this knowledge, on information and belief, Defendants ROCIO DELGADO, SHERIFF LUNA, SHERIFF ALOMA and DOES 31 through 50 have approved and ratified of the conduct and decisions of Defendants DOES 1 through 50 in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the death of MAXWELL AGUIRRE. By so doing, Defendants ROCIO DELGADO, SHERIFF LUNA, SHERIFF ALOMA and DOES 41 through 50 have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants. Furthermore, Plaintiffs are informed and believe, and thereupon allege, that Defendants ROCIO DELGADO, SHERIFF LUNA, SHERIFF ALOMA and DOES 41 through 50 and other policymaking officers for the COUNTY and LASD were and are aware of a pattern of misconduct and injury, and a code of silence, caused by COUNTY and LASD custody, medical and mental health staff personnel similar to the conduct of Defendants described herein, but failed to discipline culpable law enforcement officers and employees and failed to institute new procedures and policy within the COUNTY and LASD.

191. The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants ROCIO DELGADO, SHERIFF LUNA, SHERIFF ALOMA and DOES 31 through 50 were a moving force and/or a proximate cause of the deprivations of decedent MAXWELL AGUIRRE's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth above.

192. Defendants subjected decedent MAXWELL AGUIRRE to their wrongful conduct, depriving decedent MAXWELL AGUIRRE of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of decedent MAXWELL AGUIRRE and others would be violated by their acts and/or omissions.

193. As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants ROCIO DELGADO, SHERIFF LUNA, SHERIFF

**COMPLAINT FOR DAMAGES**

ALOMA and DOES 41 through 50 as described above, Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees.

## XIII.

## <u>SIXTH CAUSE OF ACTION</u>

### Negligence – Wrongful Death

### Plaintiffs Omar Aguirre and Yvette Aguire As Against All Defendants

194.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

195.    At all times, Defendants DOES 1 through 50 owed Plaintiffs and decedent MAXWELL AGUIRRE the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

196.    At all times, these Defendants owed Plaintiffs and decedent MAXWELL AGUIRRE the duty to act with reasonable care.

197.    These general duties of reasonable care and due care owed to Plaintiffs and decedent MAXWELL AGUIRRE by these Defendants include but are not limited to the following specific obligations:

a.    To properly identify symptoms of suicide;

b.    To properly take precautions in housing and confining an inmate who has symptoms of suicide;

c.    To house and confine a suicidal inmate in a housing cell free of suicide hazards;

d.    To summon, or transport Decedent to, necessary and appropriate emergency medical and mental health care;

e.    To refrain from unreasonably creating danger or increasing Decedent's risk of harm;

f.    To use generally accepted law enforcement procedures and tactics that are reasonable and appropriate for Decedent's status as a person in medical and mental health crisis with serious medical and mental health needs;

**COMPLAINT FOR DAMAGES**

g.      To conduct state mandated safety and welfare checks of inmates in the custody of the COUNTY Jails;

h.      To refrain from abusing their authority granted them by law; and

i.      To refrain from violating Plaintiffs' and Decedent's rights as guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

198.    All Defendants, through their acts and omissions, breached each and every one of the aforementioned duties owed to Plaintiffs and decedent MAXWELL AGUIRRE.

199.    Defendants COUNTY and LASD are vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code § 815.2.

200.    As a direct and proximate result of these Defendants' negligence, Plaintiffs and decedent MAXWELL AGUIRRE sustained injuries and damages, and against each and every Defendant named in this cause of action in their individual capacities are entitled to relief, including punitive damages against such individual Defendants.

201.    OMAR AGUIRRE and YVETTE AGUIRRE have suffered and continue to suffer, without limitation, the loss of amount of investment into Maxwell Aguirre's life to raise for over 22 years as well as the loss DECEDENTS' future love, priceless companionship, comfort, care, assistance, protection, affection, society, moral support, financial support, parental elderly care, training and guidance. Parents suffered economic losses associated with support that DECEDENT would have contributed to the family during the life expectancy and loss of gifts and benefits expected to receive from DECEDENT; funeral and burial expenses and household services DECEDENT would have provided.

**XIV.**

**SEVENTH CAUSE OF ACTION**

**Violation of California Government Code § 845.6**

**Plaintiff Estate of MAXWELL AGUIRRE As Against All Defendants**

53

**COMPLAINT FOR DAMAGES**

202.    Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

203.    All Defendants knew or should have known Maxwell Aguirre was in need of immediate medical care and treatment, and each failed to take reasonable action to summon immediate medical care and treatment. Each such individual defendant, employed by and acting within the course and scope of his/her employment with Defendants COUNTY and LASD, knowing and/or having reason to know of decedent MAXWELL AGUIRRE's need for immediate medical care and treatment, failed to take reasonable action to summon such care and treatment in violation of California Government Code § 845.6.

204.    In fact, it was more than evident that in September 2023 MAXWELL AGUIRRE's situation was dire and he needed immediate medical care. MAXWELL AGUIRRE needed immediate care to address his suicidal condition including the documented September 3, 2023 attempted suicide. Instead of providing the appropriate medical care, Defendants, and each of them, failed to take reasonable actions to summons medical care.

205.    Defendants COUNTY and LASD are vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code § 815.2.

206.    As a direct and proximate result of the aforementioned acts of these Defendants, decedent MAXWELL AGUIRRE was injured as set forth above, and their losses entitle Plaintiff to all damages allowable under California law. Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorney fees under California law, including punitive damages against these individual Defendants.

## XV.

### EIGHTH CAUSE OF ACTION

**Violation of California Civil Code § 52.1 (Tom Bane Act)**

**Plaintiff Estate of MAXWELL AGUIRRE As Against All Defendants**

54

**COMPLAINT FOR DAMAGES**

207.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

208.    Plaintiff brings the claims in this cause of action as a survival claim permissible under California law, including Cal. Code of Civ. Proc. § 377.20 *et. seq*.

209.    By their acts, omissions, customs, and policies, Defendants, each acting in concert/conspiracy, as described above, while decedent MAXWELL AGUIRRE was in custody, and by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated MAXWELL AGUIRRE's rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

a.    The right to be free from objectively unreasonable treatment and deliberate indifference to Decedent's serious medical needs while in custody as a pretrial detainee as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

b.    The right for the familial association to be free from government interference as secured by the Fourteenth Amendment to the United States Constitution;

c.    The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1; and

d.    The right to emergency medical and mental health care as required by California Government Code §845.6.

210.    Defendants' violations of decedent MAXWELL AGUIRRE's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.[11] Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of MAXWELL AGUIRRE's rights as described above, Defendants

---

[11] *See Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); *see also, Cornell v. City and County of San Francisco*, Nos. A141016, A142147, 2017 Cal. App. LEXIS 1011 at *58, f.n. 32 (Cal. Ct. App. Nov. 16, 2017) (approving M.H., supra.); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018) (following *Cornell*); *Rodriguez v. County of L.A.,* 891 F.3d 776, 799, 802 (9th Cir. 2018) (following *Cornell*).

**COMPLAINT FOR DAMAGES**

violated MAXWELL AGUIRRE's rights by the following conduct constituting threat, intimidation, or coercion:

a. With deliberate indifference to Decedent's serious medical and mental health needs, suffering, and risk of grave harm including death, depriving Decedent of necessary, life-saving care for his medical needs;

b. With deliberate indifference to hazards that posed a risk to pretrial detainees, such as Decedent;

c. Subjecting Decedent to ongoing violations of his rights to prompt care for his serious medical and mental health needs over days, causing immense and needless suffering, intimidation, coercion, and threats to his life and well-being;

d. Deliberately contracting for and causing the provision of inadequate and incompetent medical health care to Los Angeles County jail detainees and inmates;

e. Requiring medical and mental health staff to work outside their scope of practice, and conduct assessments, triage, and make medical and housing decisions for patients, including Decedent, they are not competent to make; and

f. Instituting and maintaining the unconstitutional customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as Decedent would be subjected to violence, threat, intimidation, coercion, and ongoing violations of rights as Decedent was here.

211. The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of decedent MAXWELL AGUIRRE's rights, or to any legitimate and lawful jail or law enforcement activity.

212. Further, all of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

213. Further, each Defendant violated decedent MAXWELL AGUIRRE's rights reckless disregard and with the specific intent and purpose to deprive him of his enjoyment of those rights and of the interests protected by those rights.

56

**COMPLAINT FOR DAMAGES**

214.    Defendant COUNTY is vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code § 815.2.

215.    As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of decedent MAXWELL AGUIRRE's rights under the United States and California Constitutions, Plaintiff sustained injuries and damages, and against each and every Defendant is entitled to relief, including punitive damages against all individual Defendants, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs attorneys' fees, and civil penalties.

## XVI.

## NINTH CAUSE OF ACTION

## Declaratory Relief

## (28 U.S.C § 2201)

## Plaintiffs As Against All Defendants

216.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

217.    There is an actual controversy between Plaintiffs and Defendants concerning their respective rights and duties in that Plaintiffs contend that the acts of Defendants, as described herein, are in violation of federal law, and Defendants contend in all aspects to the contrary.

218.    Plaintiffs are entitled to a legal declaration of their rights and Defendants' obligations under the applicable laws as alleged in this Complaint.

## XVII.

## TENTH CAUSE OF ACTION

**(Negligent Infliction of Emotional Distress – against Defendant REGISTERED NURSE GALEON, COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES, and**

**Does 1-50)**

219.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

220.    Plaintiffs Omar Aguirre and Yvette Aguirre learned from the County Defendants including Defendant REGISTERED NURSE GALEON, that there was an incident involving their son Maxwell Aguirre. However, they had no knowledge about the gravity of the situation.

221.    At all relevant times, defendants owed plaintiffs a duty of care, which they breached.

222.    During a telephone call to Omar Aguirre and Yvette Aguirre, NURSE GALEON lied and mislead Omar Aguirre and Yvette Aguirre about the condition of their son, Maxwell, stating that he was in "stable condition." When NURSE GALEON told Omar Aguirre and Yvette Aguirre that Maxwell was in "stable condition," he knew or should have known that Maxwell was in a coma and in critical condition. This misleading statement led to severe emotional distress of Omar and Yvette Aguirre. Additionally, Nurse GALEON refused to provide additional information to Omar and Yvette Aguirre despite the execution of a valid HIPAA release from Maxwell Aguirre to release information to his parents.

223.    Days later, when Omar Aguirre and Yvette Aguirre visited Maxwell Aguirre at Los Angeles General Hospital, they learned that they had been mislead about the condition of their son, and that his purported "stable condition" was in fact a coma with indications of irreversible brain damage. The misleading statement was a proximal cause for a delay in Omar Aguirre and Yvette Aguirre visiting Los Angeles General Hospital to see Maxwell.

224.    Plaintiffs rushed to arrange end of life arrangements for Maxwell. Maxwell was a devoutly religious man. Nevertheless, Defendants denied Maxwell of access to his pastor Dr. Mike Stephen (Lifeway Church) while in a Coma. Pastor Dr. Mike Stephen was denied access to see Maxwell and was forced to leave before he could see him. Maxwell was additionally denied access to his private attorney Brian Hurwitz. These denials constituted first amendment violations.

225.    Defendants, and each of them, knew, or with any exercise of reasonable care should have known, that their aforementioned wrongful conduct would cause Omar Aguirre and Yvette

**COMPLAINT FOR DAMAGES**

Aguirre severe emotional distress. Despite this knowledge, Defendants negligently and without exercising reasonable care, opted mislead Plaintiffs about Maxwell being in "stable condition" and impermissibly and unreasonably denied end of life consultations with Maxwell's Pastor and private attorney.

226. Defendants' conduct was outrageous. These delays and denials were outrageous and shock the conscience and caused severe emotional distress in Omar Aguirre and Yvette Aguire.

227. Defendants conduct was negligent and was a result of poor training and crisis management.

228. Omar Aguirre and Yvette Aguirre have suffered severe emotional distress as a result of Defendants' conduct.

229. Plaintiffs are informed and believe, and thereon allege, that defendants, and each of them, have been negligent by other acts or omissions of which plaintiffs are presently unaware, and which will be shown according to proof at the time of trial.

230. Defendants' conduct described herein was undertaken by the REGISTERED NURSE GALEON, COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES, and the defendants' officers, managing agents, or employees identified herein as DOES 1 through 50, inclusive, who were responsible for interacting with Plaintiffs and/or making decisions. The aforementioned conduct of said managing agents and individuals was therefore undertaken on behalf of the county defendants. Said county defendants further had advance knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized, and approved by managing agents and by other county officers, directors, or managing agents whose precise identities are unknown to plaintiffs at this time and are therefore identified as DOES 1 through 50, inclusive.

231. As a direct and proximate result of the negligent conduct of defendants, and each of them, as alleged above, plaintiffs have suffered severe physical, mental, and emotional distress and discomfort, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, all to plaintiffs' detriment and damage in an amount

**COMPLAINT FOR DAMAGES**

to be shown according to proof at the time of trial.  The emotional distress caused by defendants was beyond what a reasonable person in a civilized society can be expected to bear.

## XVIII.

## ELEVENTH CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress – against Defendant REGISTERED NURSE GALEON, COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES, and Does 1-50)**

232.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

233.    Plaintiffs Omar Aguirre and Yvette Aguirre learned from the County Defendants including Defendant REGISTERED NURSE GALEON, that there was an incident involving their son Maxwell Aguirre. However, they had no knowledge about the gravity of the situation.

234.    At all relevant times, defendants owed plaintiffs a duty of care, which they breached.

235.    During a telephone call to Omar Aguirre and Yvette Aguirre, NURSE GALEON lied and mislead Omar Aguirre and Yvette Aguirre about the condition of their son, Maxwell, stating that he was in "stable condition." When NURSE GALEON told Omar Aguirre and Yvette Aguirre that Maxwell was in "stable condition," he knew or should have known that Maxwell was in a coma and in critical condition. This misleading statement led to severe emotional distress of Omar and Yvette Aguirre. Additionally, Nurse GALEON refused to provide additional information to Omar and Yvette Aguirre despite the execution of a valid HIPAA release from Maxwell Aguirre to release information to his parents.

236.    Days later, when Omar Aguirre and Yvette Aguirre visited Maxwell Aguirre at Los Angeles General Hospital, they learned that they had been mislead about the condition of their son, and that his purported "stable condition" was in fact a coma with indications of irreversible brain damage. The misleading statement was a proximal cause for a delay in Omar Aguirre and Yvette Aguirre visiting Los Angeles General Hospital to see Maxwell.

**COMPLAINT FOR DAMAGES**

237. Plaintiffs rushed to arrange end of life arrangements for Maxwell. Maxwell was a devoutly religious man. Nevertheless, Defendants denied Maxwell of access to his pastor Dr. Mike Stephen (Lifeway Church) while in a Coma. Pastor Dr. Mike Stephen was denied access to see Maxwell and was forced to leave before he could see him. Maxwell was additionally was denied access to his private attorney Brian Hurwitz.

238. Defendants, and each of them, knew, or with any exercise of reasonable care should have known, that their aforementioned wrongful conduct would cause Omar Aguirre and Yvette Aguirre severe emotional distress. Despite this knowledge, Defendants intentionally and recklessly and without exercising reasonable care, opted mislead Plaintiffs about Maxwell being in "stable condition" and impermissibly and unreasonably denied end of life consultations with Maxwell's Pastor and private attorney. These denials constituted first amendment violations.

239. Defendants' conduct was outrageous. These delays and denials were outrageous and shock the conscience and caused severe emotional distress in Omar Aguirre and Yvette Aguire.

240. Defendants conduct was intended to further Plaintiffs suffering and cause severe emotional distress.

241. Defendants acted with reckless disregard of the probability Plaintiffs would suffer emotional distress from being mislead about Maxwell's condition and unreasonably refused to have Maxwell consult with his pastor and private attorney.

242. Omar Aguirre and Yvette Aguirre have suffered severe emotional distress as a result of Defendants' conduct.

243. Plaintiffs are informed and believe, and thereon allege, that defendants, and each of them, have been tortious by other acts or omissions of which plaintiffs are presently unaware, and which will be shown according to proof at the time of trial.

244. Defendants' conduct described herein was undertaken by the REGISTERED NURSE GALEON, COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES, and the defendants' officers, managing agents, or employees identified herein as DOES 1 through 50, inclusive, who were responsible for interacting with Plaintiffs and/or making decisions. The

**COMPLAINT FOR DAMAGES**

aforementioned conduct of said managing agents and individuals was therefore undertaken on behalf of the county defendants.  Said county defendants further had advance knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized, and approved by managing agents and by other county officers, directors, or managing agents whose precise identities are unknown to plaintiffs at this time and are therefore identified as DOES 1 through 50, inclusive.

245.    As a direct and proximate result of the reckless and intentional conduct of defendants, and each of them, as alleged above, plaintiffs have suffered severe physical, mental, and emotional distress and discomfort, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, all to plaintiffs' detriment and damage in an amount to be shown according to proof at the time of trial.  The emotional distress caused by defendants was beyond what a reasonable person in a civilized society can be expected to bear.

## XIX.

## TWELFTH CAUSE OF ACTION

**(Survival Action by Plaintiffs as Successor in Interest to Estate of Maxwell Aguirre – against All Defendants)**

246.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein, each and every allegation in paragraphs 1 through 245.

247.    As the successor-in-interest of Decedent Maxwell Aguirre, this cause of action is brought by Plaintiffs OMAR AGUIRRE and YVETTE AGUIRRE against all defendants pursuant to C.C.P. §377.34.  A successor-in-interest declaration pursuant to C.C.P. §377.32 is filed concurrently herewith.

248.    COUNTY Defendants are subject to liability pursuant to Gov't. Code §815.2(a) which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him/her to liability.  Defendants ROCIO DELGADO, REGISTERED NURSE GALEON, SHERIFF ALOMA, SHERIFF LUNA, and DOES

1 to 50 are employees and were acting within the course and scope of their employment with the COUNTY Defendants and are subject to liability pursuant to Gov't. Code §820(a).

101.    As a proximate result of the wrongful conduct of all defendants as alleged, Decedent MAXWELL AGUIRRE suffered loss or damage before his death, including pre-death pain and suffering and medical expenses which the ESTATE OF MAXWELL AGUIRRE may recover in damages.  The ESTATE OF MAXWELL AGUIRRE is further entitled to punitive and exemplary damages which decedent would have been entitled to recover against all defendants, except COUNTY, had he lived.

## XX.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully requests that the Court enter a judgment as follows:

A.    Wrongful death of MAXWELL AGUIRRE, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

B.    Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

C.    MAXWELL AGUIRRE's coroner's fees, funeral and burial expenses, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq.;

D.    Violation of MAXWELL AGUIRRE's constitutional rights, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq. and federal civil rights law;

E.    MAXWELL AGUIRRE's loss of life, pursuant to federal civil rights law;

F.    MAXWELL AGUIRRE's conscious pain, suffering, and disfigurement, pursuant to federal civil rights law;

G.    General Damages, including wrongful death and survival damages, in excess of the mandatory amount for jurisdiction in the Unlimited Superior Court;

**COMPLAINT FOR DAMAGES**

H.    Non-Economic Damages, including wrongful death and survival damages, according to proof plus all further and proper relief;

I.    Punitive damages as alleged herein

J.    Attorney's fees pursuant to State Law (Cal. Code Civ. Proc. § 1021.5 & private attorney general doctrine);

K.    A multiplier of damages, including treble damages, under the Tom Bane Act;

L.    Penalties under the Tom Bane Act;

M.    Interest; and

N.    All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1; and as otherwise may be allowed by California and/or federal law.

O.    Aggregately, Plaintiffs demand $100 million from Defendants.

Dated: June 20, 2024                           O'HARA LAW, APC

By: _____
Kevin O'Hara, Esq.
Attorneys for Plaintiffs,
ESTATE OF MAXWELL AGUIRRE, OMAR AGUIRRE,
and YVETTE AGUIRRE

64

**COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

Plaintiffs, ESTATE OF MAXWELL AGUIRRE, by and through successors in interest, Omar Aguirre and Yvette Aguire.; Omar Aguirre, individually; and Yvette Aguirre, individually, hereby make a demand for a jury trial in this action.

Dated: June 20, 2024                    O'HARA LAW, APC

By: _____
Kevin O'Hara, Esq.
Attorneys for Plaintiffs,
ESTATE OF MAXWELL AGUIRRE, OMAR AGUIRRE,
and YVETTE AGUIRRE

65

**COMPLAINT FOR DAMAGES**